ANDERSON-CLAYTON SECURITIES CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78340. Promulgated March 31, 1937.

796

*John C. White, Esq.*, for the petitioner.
*Dean P. Kimball, Esq.*, for the respondent.

OPINION.

MILLER: The Commissioner determined a deficiency in income tax of the petitioner and affiliated companies for the fiscal year ended July 31, 1931, in the amount of $17,837.44.

The petitioner contends that the respondent erred (1) in holding that the Abilene Cotton Oil Co., the Lockney Cotton Oil Co., Munday Cotton Oil Co., Plainview Cotton Oil Co., Slaten Cotton Oil Co., and Winters Cotton Oil Co. were not affiliated during the fiscal year ended July 31, 1931, with the affiliated group of which the petitioner is the parent corporation; (2) in failing to allow as a credit the amount of $19,989.53 paid to British India by a member of the affiliated group; and (3) in failing to allow as a deduction accrued claims and expenses in the amount of $70,976.57. The petitioner claims that as a result of such alleged errors it is entitled to a refund for overpayment of taxes in the amount of $28,506.72 with interest.

The facts were stipulated. We adopt them as our findings, and set out here only those necessary for an understanding of the questions presented.

The first question to be determined is whether the six companies included in the amended consolidated return for the fiscal year ended July 31, 1931, were, during that year, affiliated with the petitioner, within the meaning of section 141 (d) of the Revenue Act of 1928.[1]

---

[1] (d) Definition of "affiliated group".—As used in this section an "affiliated group" means one or more chains of corporations connected through stock ownership with a common parent corporation if—

(1) At least 95 per centum of the stock of each of the corporations (except the common parent corporation) is owned directly by one or more of the other corporations; and

(2) The common parent corporation owns directly at least 95 per centum of the stock of at least one of the other corporations.

As used in this subsection the term "stock" does not include nonvoting stock which is limited and preferred as to dividends.

In answering this question consideration must be given, not only to the common stock, but to the preferred stock of the six companies, because, under the facts stipulated, such preferred stock in each case had acquired voting rights. See Vermont Hydro-Electric Corporation, 29 B. T. A. 1006; *Pantlind Hotel Co.*, 23 B. T. A. 1207; *Atlantic City Electric Co.* v. *Commissioner*, 288 U. S. 152.

Anderson-Clayton Industries, Inc., a member of the affiliated group, owned 100 percent of the preferred stock of all six companies. It also owned 64 percent of the common stock of each of the six companies; measured in number of shares. The preferred stock of each of the six companies had a voting power of 50 votes per share and a par value of $100 per share. The common stock of each of the six companies had a voting power of one vote per share and a par value of $2 per share. Thus, using the Abilene Cotton Oil Co. as an example, we see that Anderson-Clayton Industries, Inc., owned all of the 4,800 shares of preferred stock, which had a par value of $480,000 and a voting power of 240,000 votes. Of the 10,000 shares of common, the 6,400 shares owned by Anderson-Clayton Industries, Inc., had a par value of $12,800 and a voting power of 6,400 votes. The 3,600 shares of common stock remaining had a par value of $7,200 and a voting power of 3,600 votes. Petitioner contends that, calculating the stock ownership by the amount invested and voting strength, Anderson-Clayton Industries, Inc., owned 98.56 percent of the total Abilene stock. Respondent contends that the only basis for calculation of stock ownership is by shares, and, consequently, since petitioner owned only 64 percent of the shares of common stock, it owned only 75.67 percent of the combined classes of stock. This amount, obviously, is far below the 95 percent required by the statute.

We can not agree with respondent's contention. If Congress had wished to make ownership of a certain percentage of shares determinative, it could easily have done so by using the word *shares* as it has done in other instances; for example, in the Revenue Act of 1928, section 112 (i) (1), relating to reorganization, to which reference is hereinafter made. Here, the language of the statute is ownership of *stock*.

It is quite true, as urged by respondent, that the words "stock" and "shares" are sometimes used interchangeably and synonymously. *Wright* v. *Georgia Railroad & Banking Co.*, 216 U. S. 420, 425; *Eisner* v. *Macomber*, 252 U. S. 189. Respondent refers also, in his brief, to similar usage in decisions of this Board, interpreting the terms "majority of stock" and "majority of shares of stock", as those terms are found in the statutes. *Thomas W. White* (1928 Act) 29 B. T. A. 1272; affirmed in *Fordyce* v. *Helvering*, 76 Fed. (2d) 431; *Von Weise* v. *Commissioner*, 69 Fed. (2d) 439, affirming *Philip D. C.*

*Ball* (sec. 203 (h) (1), 1926 Act), 27 B. T. A. 388; *Federal Grain Corporation* (sec. 203 (i), 1924 Act), 18 B. T. A. 242, 248. In none of them was any question raised concerning the interchangeable use of the words; and in none of them does it appear that there was any difference in par value or voting power of the different types of stock.

That the words are not always used interchangeably or synonymously is equally certain. Thus, in *Ray Copper Co.* v. *United States,* 268 U. S. 373, the Court said: "The capital stock of a corporation, its net assets and its shares of stock are entirely different things." In *Trask* v. *Maguire,* 18 Wall. 391, 402, the Court said: "The term (s) 'stock of the company' imported the capital stock of such company, the subscribed fund which the company held, as distinguished from the separate interests of the individual stockholders." Again, in *Wright* v. *Georgia Railroad & Banking Co., supra,* the Court said:

There is an obvious distinction between the capital stock of an incorporated company and the "shares" of the company. The one is the capital upon which the business is to be undertaken, and is represented by the property of every kind acquired by the company. Shares are the mere certificates which represent a subscriber's contribution to the capital stock and measure his interest in the company.

See also *Powers* v. *Detroit & Grand Haven Railway,* 201 U. S. 543, 559, and cases there cited.

Where synonymous usage does occur it results, no doubt, from the assumption, frequently made, that each share represents an equal interest in the stock of the company; *Continental Securities Co.* v. *Interborough Rapid Transit Co.,* 165 Fed. 945, 963, quoting from the Century Dictionary; and that each share of stock is entitled to one vote. III Cook on Corporations (8th ed.) 2123, §609. Where corporate organization follows such a simple and conventional form, then the method of calculation suggested by respondent will produce a normal result. Where, as in this case, different types of shares represent different proportionate interests and different voting powers, such a method of calculation may produce results contrary to the clear purpose of the statute.

The terms "share", "stock", "capital", and "capital stock" are of frequent but not uniform use. *Powers* v. *Detroit & Grand Haven Railway, supra.* The Supreme Court of the United States has said that the term "capital stock" has no fixed meaning or significance in taxing statutes. *Ray Copper Co.* v. *United States, supra.* In the absence of definition or fixed meaning, it is necessary to construe these words as they may be found in a particular statute "by reference to the context, the nature and purpose of the statute, its history and other aids to construction." *Ray Copper Co.* v. *United States,*

*supra.* See also *Wright* v. *Georgia Railroad & Banking Co., supra;* *Powers* v. *Detroit & Grand Haven Railway, supra.*

As regards the nature and purpose of the statute the Supreme Court has said:

The purpose of section 240 was, by means of consolidated returns, to require taxes to be levied according to the true net income and invested capital resulting from and employed in a single business enterprise, even though it was conducted by means of more than one corporation. [*Handy and Harmon* v. *Burnet*, 284 U. S. 136, 140.]

Following this statement in the opinion, article 631 of Regulations 45, is set out in a note. That article contains the following statement of purpose:

Where such branches or units of a business are owned and controlled through the medium of separate corporations, it is necessary to require a consolidated return in order that the invested capital and net income of the entire group may be accurately determined.

See also *Atlantic·City Electric Co.* v. *Commissioner*, 288 U. S. 152; *Commissioner* v. *Aluminum Goods Manufacturing Co.*, 287 U. S. 544.

There can be no doubt that Anderson-Clayton Industries, Inc., owned shares of stock in each of the six companies, representing more than 95 percent of the capital stock. This being true, the purpose of the section can be best achieved by holding that affiliation existed.

The context in which the word is used may well be considered in connection with the history of the section. The Revenue Act of 1918, section 240 (b), allowed affiliation or the making of consolidated returns by a group of corporations where one corporation "owns directly or controls * * * substantially all the stock." An identical provision occurs in the Act of 1921, section 240 (c). The Revenue Act of 1924, section 240 (c), provided that two or more domestic corporations should be deemed affiliated "(1) if one corporation owns at least 95 per centum of the voting stock of the other or others or (2) if at least 95 per centum of the voting stock of two or more corporations is owned by the same interests." The Revenue Act of 1926, section 240 (c), reproduced the quoted provision of the Act of 1924, but confined its application to affiliation during the year 1925; and added in section 240 (d), for application in the year 1926 and thereafter, the same provision except for the omission of the word "voting" and with this qualification: "As used in this subdivision the term 'stock' does not include nonvoting stock which is limited and preferred as to dividends." This, then, is the prototype of section 142 (c) of the Revenue Act of 1928, now before us. This historical analysis of the provision reveals that in the later acts the words "substantially all" were eliminated, probably because they

were too indefinite; and that although the word "controls" was also eliminated, the idea of control, as well as ownership of the stock is retained in part, at least, by inserting, in the 1924 Act, the word "voting" before the word "stock" and by adding, in the 1926 and subsequent acts, the provision relating to nonvoting stock.

In *Atlantic City Electric Co.* v. *Commissioner*, *supra*, the Supreme. Court said (p. 384) : "The requirement of control, in the absence of legal title or beneficial ownership, is not satisfied by acquiescence or by business considerations without binding force. There must be a control that is legally enforceable." Whether we think of control in terms of "substantially all" of the stock or in terms of 95 per centum of the stock, the result is the same. Anderson-Clayton Industries, Inc., held legal title to stock possessing more than 95 per centum of the total voting power and enjoyed a beneficial ownership of more than 95 per centum of the capital stock. There was certainly a control which was legally enforceable.

In *Palgrove Co.* v. *Commissioner*, 63 Fed. (2d) 810, the court said:

The only question in this case is whether the petitioner was affiliated with A. Klipstein & Co. We may ignore the other two parties to the affiliation. We regard the case as ruled by *Harman* v. *Burnet*, 284 U. S. 136, 52 S. Ct. 51, 76 L. Ed. 207. The change in the act of 1918 limits, rather than extends, affiliation. The original act (section 240 (b), 40 Stat. 1082) read "owned or controlled"; the Revenue Act of 1926, under which this case arises (section 240 (c), 26 USCA § 993 and note) uses only the word, "owned". It is plain that the "same interests" did not own 95 per cent of both companies. August Klipstein, Jr., owned 98 per cent of the petitioner and 25 per cent of A. Klipstein & Co. The other three owners (we omit August Klipstein, Sr's., insignificant holding), also each owned 25 per cent. It is true that these three were members of the same family as August Klipstein, Jr., and we may assume that in practice they acted in concert with him, but they had neither beneficial nor legal ownership of any shares in the Palgrove Company, and it is this alone which counts.

It will be noted that the court, while expressly recognizing the change in statutory language from "owned or controlled" to "owned", pointed out, in denying affiliation, that the same interests "did not *own* 95 per cent of *both companies*. August Klipstein, Jr. *owned* 98 per cent of *the petitioner* and 25 per cent of *A. Klipstein & Co.*"

In the same sense, it is clearly apparent that Anderson-Clayton Industries, Inc., *owned* more than 95 percent of *the six companies*. Our conclusion is that they were affiliated with the petitioner during the taxable period.

Petitioner claims credit for $19,985.53 taxes paid to British India, for the British Indian tax year April 1, 1932, to March 31, 1933, upon income received by petitioner for its fiscal year, which ended

July 31, 1931. There is no dispute as to the character of the tax, credit for which is claimed, or as to the amount thereof. Respondent concedes that petitioner is entitled to an additional credit; less, however, than $19,985.53, on the theory that the tax exceeds the net Indian income, and that credit can not be allowed for income taxes paid to a foreign country in excess of the net income derived from that country.

Section 131 of the Revenue Act of 1928, in so far as applicable here, provides as follows:

(a) *Allowance of credit.*—The tax imposed by this title shall be credited with:

(1) CITIZEN AND DOMESTIC CORPORATION.—In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war-profits, and excess-profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States;

\* \* \* \* \* \* \*

(b) *Limit on credit.*—In no case shall the amount of credit taken under this section exceed the same proportion of the tax (computed on the basis of the taxpayer's net income without the deduction of any income, war-profits, or excess-profits tax any part of which may be allowed to him as a credit by this section), against which such credit is taken, which the taxpayer's net income (computed without the deduction of any such income, war-profits, or excess-profits tax) from sources without the United States bears to his entire net income (computed without such deduction) for the same taxable year.

\* \* \* \* \* \* \*

The operation of the limitation provided for in the section set forth above, is illustrated in article 696 of Regulations 74 as follows:

Income from sources within the United States_____ $50,000.00
Income from sources without the United States_____ 25,000.00

Total net income (without deduction of income and profits taxes paid or accrued to foreign countries or possessions of the United States _____ 75,000.00
United States income tax on $75,000_____ 10,183.75
Foreign income and profits taxes upon $25,000_____ 5,000.00
Amount which may be credited against the United States tax $\frac{25000}{75000}$ of $10,183.75_____ 3,394.58

Subsection (b) of the section quoted above contains the only limitation upon the amount of the credit deductible for foreign taxes paid or accrued during the taxable year involved. That limitation is based upon the ratio of net income derived from all sources without the United States to the total net income of the taxpayer, and not, as respondent contends, upon the ratio of net income derived from the country to which the tax was paid. Although the point is not argued in his brief, its submission to the Board suggests that respondent seeks to construe section 131 (b) of the 1928

Act in such manner as to read into it the new limitation which appeared for the first time in section 131 (b) (1) and (2) of the 1932 Act. Such a construction is clearly unjustified. The language of the House Reports on section 131 of the Revenue Bill of 1932 clearly indicates an intention on the part of Congress to amend the existing law and not merely to establish or impose a construction of the earlier statute. See House Report, pp. 23, 24,[2] and Senate Report, p. 32.[3] If any doubt exists as to the intention of Congress on the point, it should be resolved in favor of the taxpayer, *Gould* v. *Gould*, 245 U. S. 151. See also, *Lewellyn* v. *Frick*, 268 U. S. 238; *Smietanka* v. *First Trust & Savings Bank*, 257 U. S. 602; *United States* v. *Field*, 255 U. S. 257. Our decision is that an additional credit shall be allowed.

The last issue to be considered involves the question whether Anderson, Clayton & Co., a member of the affiliated group, is entitled to deduct the amount of $70,976.57, consisting of two items of $68,440.41, supplemental cost of cotton purchased under patronage contracts, and $2,536.16, office expense. At the end of the fiscal year here involved the Los Angeles office of Anderson, Clayton & Co. calculated its net profits in accordance with its so-called patronage contracts with Arizona and California cotton growers. The amount owing as supplemental prices payable to cotton growers under such contracts as of July 31, 1931, consisted of one-half of the net profits earned during the taxable year by the sale during that year, of cotton so purchased, and was estimated to be $124,926.75. Of this amount $39,926.75 had been paid during the fiscal year ended July 31, 1931, and this amount was allowed as a deduction by the respondent. The remainder, or $85,000, was set up on its books as a liability in an account entitled "Reserve for Patronage Contracts." In the succeeding year the company paid, under such contracts for account of the Arizona and California cotton growers, the amount

---

[2] *Subsection* (b). Under section 131 (b) of the existing law the credit allowed for taxes paid to foreign countries is subjected to a limitation in order to prevent foreign taxes from absorbing the tax on income from sources within the United States. This limitation being based upon the ratio of net income derived from all sources without the United States to the total net income, gives preferential treatment to some taxpayers deriving income from more than one foreign country. * * *

Accordingly, a further limitation has been placed upon the credit so that in the case of any one country the credit for taxes paid thereto may not exceed an amount which bears the same relation to the total tax as the net income from the country imposing such tax bears to the total net income.

[3] In addition to the limitation contained in the existing law, by reason of which the credit for foreign taxes may not exceed the same proportion of the tax against which the credit is taken which the amount of net income from foreign sources bears to the total net income, the House bill added the limitation that the credit for taxes paid to any country should not exceed the same proportion of the tax as the income from that country bears to the total income. In the judgment of your committee, this additional limitation *imposes undue restrictions upon our citizens doing business in foreign countries, and it has* therefore been eliminated.

of $68,440.41. Petitioner contends that it is entitled to this further deduction.

Reserves as. such are not deductible, except such reserves as are specifically provided for in the revenue acts, "but when an item is without question within the realm of ordinary and necessary business expenses, it may be deducted in the case of a taxpayer on an accrual basis, in the year in which incurred, regardless of the style of accounting nomenclature by which it may be called." *Rogers, Brown & Crocker Brothers, Inc.*, 32 B. T. A. 307. It was stipulated that petitioner observed an accrual method of accounting and filed its returns on the accrual basis.

The liability of Anderson, Clayton & Co. for supplemental payments made to the growers, accrued, under the patronage contracts, for cotton purchased and sold during that year. Although the actual amount of the liability was not definitely established in the fiscal year which ended July 31, 1931, it arose out of business transacted, and represented a part of the cost of the cotton purchased and sold during that year. Where all events have occurred within the taxable year which determined the liability of the taxpayer, that liability properly may be said to be accrued, although the amount thereof has not been definitely ascertained during the year. In the words of Mr. Justice Hand "It was unknown not unknowable." *Uncasville Manufacturing Co.* v. *Commissioner*, 55 Fed. (2d) 893, 895. See also *Brown* v. *Helvering*, 291 U. S. 193; *United States* v. *Anderson*, 269 U. S. 422; *Helvering* v. *Russian Finance Co.*, 77 Fed. (2d) 324.

To compute correctly the profit earned on cotton sold during the taxable year, the entire cost of such cotton should be taken into consideration. The liability for such supplemental cost set up on the books of account was definitely established to the extent of $68,-440.41 in the succeeding fiscal year. Under the circumstances, therefore, we hold that this item is deductible. See *Home Builders Shipping Association*, 8 B. T. A. 903; *Anamosa Farmers Creamery Co.*, 13 B. T. A. 907; *Farmers' Union Co-Operative Association*, 13 B. T. A. 969; cf. *Farmers Union State Exchange*, 30 B. T. A. 1051, 1066.

One final point remains for consideration, namely, the disallowance by the Commissioner of expenses in the amount of $2,536.16. It was stipulated that:

XXXV

Petitioner incurred other expenses of $10,068.13 during the year involved on account of the Los Angeles office and has thus far been allowed by the Commission as a deduction only $7,531.97 of said amount.

In petitioner's brief (p. 29) the following statement is made:

During the following year taxpayer paid out $68,440.41 on account of such liabilities, and in addition wrote down the reserve $2,536.16 which due to the

**804**

method of handling by the revenue agent resulted in an unintentional disallowance of $2,536.16 of other accrued expenses. (Stipulation paragraph XXXV.)

As respondent does not argue—or even mention—the point in his brief, we assume that the parties intended to stipulate that these expenses were ordinary and necessary expenses paid or incurred during the taxable year in carrying on petitioner's business pursuant to the terms of section 23 (a) of the Revenue Act of 1928, and we hold that the petitioner is entitled to this deduction.

Reviewed by the Board.

*Decision will be entered under Rule 50.*