COMMERCIAL FISHERMEN'S INTER-INSURANCE EXCHANGE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74289. Filed September 21, 1962.

*Harrison Harkins, Esq.*, for the petitioner.
*David R. Brennan, Esq.*, for the respondent.

SCOTT, *Judge:* Respondent in his notice of deficiency determined deficiencies in petitioner's income tax for the years and in the amounts as follows:

| Year | Deficiency |
|------|-----------|
| 1952 | $4, 998. 08 |
| 1953 | 21, 500. 66 |
| 1954 | 17, 086. 45 |
| 1955 | 48, 532. 33 |

By amended petition, petitioner alleged that it sustained a net operating loss for its taxable year 1957, thus becoming entitled to a net operating loss deduction for its taxable year 1955, and also claiming net operating loss carrybacks from 1955 and 1956 to 1953 and 1954. Respondent, by amendment to answer, alleged that the amount of excess profits credit carryover as used by petitioner in the computation of its income and excess profits taxes for the years 1952 and 1953 was overstated, that the amount of dividend payments disallowed in the notice of deficiency for the years 1952, 1953, and 1954 was understated, that the amount of dividend payments disallowed for the year 1955 was overstated, and, therefore, the deficiencies in income and excess profits taxes as shown in the statutory notice of deficiency were understated by $17,408.21, $35,703.49, and $19,044.47 for the years 1952, 1953, and 1954, respectively, and that the deficiency as shown in the notice of deficiency for the year 1955 was overstated by the amount of $44,699.26. Respondent, in his amendment to answer, claimed the increased deficiencies for the years 1952, 1953, and 1954 under the provisions of section 272(e) of the Internal Revenue Code of 1939 and section 6214(a) of the Internal Revenue Code of 1954.

A number of issues raised by the pleadings have been settled by the parties, and one issue was conceded by respondent on brief, leaving for our decision the following:

(1) Whether petitioner is entitled to deduct as dividends declared, under section 204(c)(11) of the Internal Revenue Code of 1939 and section 832(c)(11) of the Internal Revenue Code of 1954 the total earnings referred to in the resolution declaring the dividend or whether such amounts should be reduced by loss retentions from subscribers who had sustained losses during the years for which earnings were being distributed and percentage amounts shown in the resolutions as contributions from subscribers for the purpose of retiring outstanding certificates of contribution issued to petitioner's attorney in fact.

(2) Whether petitioner is entitled to deduct for the year 1957, in computing its net operating loss carryback to the year 1955, either as a loss incurred under section 832(b)(5) of the Internal Revenue Code of 1954 or as a bad debt, an amount of $53,219.63 of uncollected reinsurance proceeds.

(3) Whether this Court has jurisdiction over the increased deficiencies claimed by respondent which arise from his alleged reduction of the excess profits credit carryovers available to petitioner in 1952 and 1953 because of adjustments to petitioner's excess profits income and credits for the years 1950 and 1951.

FINDINGS OF FACT.

All of the facts with respect to the issues herein except those involving the deductibility of petitioner's uncollected reinsurance proceeds claimed by it to be deductible in the year 1957 have been stipulated and are found accordingly.

Petitioner is an unincorporated interinsurance exchange which was organized in September 1943 pursuant to the provisions of chapter 3, part 2, division 1, of the California Insurance Code.

For its taxable years ended December 31, 1952, 1953, 1954, and 1955, petitioner filed its Federal income tax returns with the district director of internal revenue at Los Angeles, California.

Petitioner maintains its books and reports its income on an accrual basis of accounting.

Sometime prior to 1943, a small group of commercial fishermen in San Pedro, California, who had organized for the purpose of the mutual exchange of ideas relating to the tuna fish industry "The Fishermen's Fraternal Society," decided as members of that society to attempt to qualify as a marine interinsurance exchange for the purpose of insuring their own fishing boats. With this in view they caused to be incorporated on February 15, 1943, a California corporation, Commercial Fishermen's Fraternal Society, Inc., with the intention of having it act as attorney in fact for such interinsurance exchange.

On September 10, 1943, the California insurance commissioner issued to Commercial Fishermen's Fraternal Society, Inc., as attorney in fact for Commercial Fishermen's Inter-Insurance Exchange, petitioner herein, his certificate of authority No. 82 to transact marine, fire, and automobile insurance, and concurrently with the issuance of this certificate of authority the insurance commissioner issued permit No. 170, authorizing petitioner to issue a certificate of contribution in the amount of $100,000 to its attorney in fact, Commercial Fishermen's Fraternal Society, Inc., for cash in that amount paid over by such attorney in fact to petitioner.

Commercial Fishermen's Fraternal Society, Inc., paid over to petitioner the $100,000, which amount had been contributed to the society

by fishing boat owners who intended to become subscriber-members of petitioner.

Since its organization petitioner has operated as a marine insurance company whose subscribers exchange reciprocal policies of insurance through the medium of its attorney in fact. The policies exchanged consist principally of assessable policies of marine insurance on commercial fishing vessels owned by the policyholders.

On September 10, 1943, petitioner issued to Commercial Fishermen's Fraternal Society, Inc., the $100,000 certificate of contribution authorized by the insurance commissioner's permit No. 170. This certificate recited that Commercial Fishermen's Fraternal Society, Inc., had advanced to petitioner $100,000, which $100,000 with interest at the rate of 5 percent per annum shall be payable by petitioner upon the surrender of the certificate only at the option of a majority of the board of governors of petitioner and only to the extent of the surplus remaining after providing for all requirements, reserves, surpluses, minimum funds, or other liabilities, and when petitioner's financial condition shows that its admitted assets exceed its liabilities by more than $300,000. The certificate provided that should petitioner discontinue business, the certificate should be paid only after payment of all claims and liabilities. It further provided that repayment in whole or in part of the principal of the certificate should not be made without the prior approval of the insurance commissioner of the State of California. The permit to issue the certificate was issued upon specific conditions and the certificate was to be effective only as a transaction in conformity with those conditions. These conditions included the provisions of the certificate, except that condition three provided that the return of the contribution, in whole or in part, and the payment of any interest thereon, shall be made only from admitted assets of petitioner in excess of all of its liabilities and the sum of $100,000. The conditions also provided that no repayment of the $100,000 contribution or interest thereon or any part thereof should be made without the approval in writing of the insurance commissioner of the State of California.

On June 6, 1946, the California insurance commissioner issued his permit No. 241, authorizing petitioner to issue to Commercial Fishermen's Fraternal Society, Inc., a certificate of contribution in the amount of $200,000 in exchange for cash advanced to petitioner. Petitioner issued the $200,000 certificate of contribution on July 10, 1946. This certificate stated that Commercial Fishermen's Fraternal Society, Inc., had advanced to petitioner the sum of $200,000. The repayment conditions of this certificate were substantially the same as

those with respect to the $100,000 certificate, except that this certificate recited that the $100,000 certificate was presently outstanding. The permit to issue this $200,000 certificate of contribution was upon conditions similar to those for the issuance of the $100,000 certificate except that the requirement of surplus in excess of liabilities stated in these conditions was $300,000, and petitioner was required to show the surplus created by receipt of this contribution on its records and accounts to be contributed surplus with a note that the surplus is subject to a contingent liability for outstanding contribution certificates. The conditions on this certificate also carried a limitation that the contributed surplus may not be, under any circumstances, disbursed by way of dividends to subscribers of petitioner; and in the event of the dissipation or loss of any portion of such contributed surplus, no funds of petitioner may be disbursed by way of dividends to its subscribers until the portion of such contributed surplus so dissipated or lost has been reimbursed by profits earned by petitioner.

Commercial Fishermen's Fraternal Society, Inc., obtained the $200,000 which it advanced to petitioner in 1946 from various persons who were subscriber-members of petitioner and issued to each such person a note which recited that Commercial Fishermen's Fraternal Society, Inc., was the attorney in fact for petitioner and had donated the sum of $100,000 to petitioner to be used as surplus and had agreed to donate an additional $200,000 to petitioner so as to provide it with surplus funds of no less than $300,000, and further recited the conditions of repayment by petitioner to Commercial Fishermen's Fraternal Society, Inc., of the $200,000. The note then provided that for value received Commercial Fishermen's Fraternal Society, Inc., promised to pay to the named subscriber the principal sum contributed "when, as, and if said $300,000 shall be repaid" to Commercial Fishermen's Fraternal Society, Inc., by petitioner, and then provided for a pro rata repayment, should petitioner make a payment on the $300,000 of less than the full amount thereof. The note further provided for 5 percent per annum interest, payable when, as, and if a similar amount of interest was received by Commercial Fishermen's Fraternal Society, Inc., from petitioner.

In 1951, following petitioner's request for and receipt of permission from the California Department of Insurance to retire the $100,000 certificate of contribution authorized by permit No. 170, such certificate was paid off and retired.

The $200,000 certificate of contribution was paid off and redeemed by petitioner in installments as follows:

1954_____ $83, 543. 18
1955_____ 16, 456. 82
1959_____ 100, 000. 00

Petitioner, upon its organization, adopted bylaws which were from time to time amended in accordance with the provisions for amendment contained therein. These bylaws, as in effect during the years here in issue, provided that each vessel insured is entitled to one vote, and if there is more than one subscriber for a boat, such vote is divided in the manner provided by the subscribers. The bylaws further provided that a board of governors shall manage, control, and administer the affairs of petitioner and that the members of the board are to be elected by a majority vote of a quorum of the subscribers. Article XII of petitioner's bylaws provided as follows:

Section 1. The Board of Governors, by a majority vote, shall in their discretion from time to time promulgate schedules of profit to be distributed to the subscribers from the proceeds of the Exchange, but in event a policy is cancelled at the discretion of the Exchange, or at the request of the subscribers, or in event the insured vessel is sold and the subscriber discontinues his fishing activities, the Exchange may then refund to such subscriber at the close of the fiscal year the accumulated unused portion of his deposit premiums computed in accordance with the rules and regulations of the Exchange.

Section 2. The Exchange shall pay to the attorney-in-fact who advanced money for the required guarantee fund, interest on same at the rate of 5% per annum on such outstanding advances.

Section 3. The Board of Governors of the Exchange may at their discretion set aside a fixed percentage (not to exceed 5%) of the amount at risk of each subscriber to establish a fund to be used for the purpose of retiring the guarantee fund originally paid in by the subscribers. Such funds also may at the discretion of the Board of Governors, be used to repay the guarantee fund deposit made by a retiring subscriber.

Section 4. In no event shall profits be declared or paid, or any refunds made to subscribers, which would tend to reduce the surplus as regards to the policyholders of the Exchange below $300,000.00.

At the first annual meeting of the subscribers on September 22, 1943, there was a discussion of whether or not a loss should be charged against premium refunds and such charges set aside as contribution by such subscribers to create a fund to be used to retire the notes given by petitioner to its attorney in fact, and following such discussion the following resolution was unanimously adopted:

BE IT RESOLVED:

That the losses be charged against premium refund net savings on Hull policies and be set aside as voluntary contribution by such subscribers to create a fund to be used to retire the notes given by the Attorney-in-fact for the guarantee fund, as such guarantee fund is required by the Insurance Commissioner of the State of California for the operation of Commercial Fishermen's Inter-Insurance Exchange.

At a meeting of the board of governors on December 20, 1945, the following resolution was adopted:

WHEREAS, the books of account of the Exchange now show that the Exchange had $55,549.11 on hand as of December 31, 1944, over and above the cost of insurance subscribers, and it is deemed to be to the best interests of the subscribers that said sum be distributed pro rata in cash to the subscribers of the Exchange whose policies terminated during the year 1944 as shown on the books of the Exchange as of December 31, 1944—

Now, THEREFORE, BE IT RESOLVED that the sum of $55,549.11 be distributed pro rata in cash to the subscribers of this Exchange, whose policies terminated during the year 1944 as shown on the books of the Exchange as of December 31, 1944. That is to say, that a distribution shall be made to said subscribers pro rata based on the premium earned from each such subscriber by the Exchange during the year 1944.

At a meeting of the board of governors on January 19, 1946, a similar resolution was adopted with respect to the $56,341.60 on hand as of December 31, 1945, over and above the cost of insurance to its subscribers. At a meeting of the board of governors on December 23, 1946, the following resolution was adopted:

BE IT RESOLVED: That the pro-rata net savings of earned premiums on policies terminated during the year of 1946, as shown by the books of accounts of December 31, 1946, as being over and above the cost of insurance to its subscribers, be paid to such subscribers pro-rata based on the premium earned from each such subscriber of the Exchange during the year 1946.

BE IT FURTHER RESOLVED: That 15% of 1946 premium refunds paid, be contributed by the subscribers to create a fund to be used to retire the notes given by the attorney-in-fact for the $300,000.00 guarantee fund as required by the Insurance Commissioner of California for the operation of the Commercial Fishermen's Inter-Insurance Exchange.

Substantially this same resolution was adopted at meetings of the board of governors in December of 1947, 1948, 1949, 1950, and November 1951, referring in each instance to the net savings of earned premiums on policies terminated as of December 31 of the year in which the meeting of the board of governors was held.

The minutes of the meeting of the board of governors on December 13, 1952, contained the following:

There was a discussion regarding the 15% contribution which has and will be accumulated by the owner putting this money in the Exchange and the disposition of same when the debt of $300,000.00 has been paid off. There was a feeling by the Board of Governors that some consideration should be shown to these owners who have given this 15% contribution to the Exchange. The Secretary was instructed to get legal advice from Mr. Callaway and also that all information be passed on to the Insurance Commissioner, State of California for approval and be submitted at the Annual Meeting. It was also suggested that some arrangement be made on the dividends to build up a surplus when we have good years and take care of the bad years. It was felt that some plan be submitted to the members at the annual meeting.

On January 31, 1953, the subscribers of petitioner, at their annual meeting, adopted the following resolution:

RESOLVED that the dividends currently earned in the sum of $45,839.00 be paid out to the subscribers and that 75% of said dividends be recontributed to the Exchange as unearned surplus for the purpose of retiring the outstanding certificates of contribution.

The minutes of this same meeting show that a discussion was had as to a plan to be formulated to see that all owners of boats were treated fairly and that their interest in the Exchange be equalized by their contributions after the retirement of the outstanding certificates of contribution. The attorney for the Exchange was instructed to handle the legal phases of such a plan to be presented at the next annual meeting.

At the meeting of the board of governors on November 19, 1953, a resolution was adopted that there be placed on the agenda for consideration by the subscribers at the annual meeting, a proposed resolution to amend the bylaws to increase the surplus of the Exchange over and above its existing liabilities to the sum of $500,000 after the retirement of the existing certificate of contributions outstanding in the sum of $200,000. The resolution provided for contributions by each subscriber to the attorney in fact, the attorney in fact to contribute the sum so paid to petitioner, but that subscribers not desiring to contribute cash could, in lieu thereof, agree to contribute to the attorney in fact 75 percent of their annual dividend. At their annual meeting on January 23, 1954, the subscribers adopted the resolution proposed by the board of governors and in addition, adopted the following resolution:

BE IT RESOLVED that the profits currently earned in the sum of $73,614.32 for the year 1953 be paid out to the subscribers as a dividend to each subscriber in direct proportion in which such subscriber's premium have contributed to said profit of $73,614.32 and that 75% of said dividends be contributed by each of the subscribers back to the Exchange as unearned surplus for the purpose of retiring the outstanding certificate of contribution.

At the annual meeting of the subscribers on February 5, 1955, the following resolution was adopted:

BE IT RESOLVED that the Board of Governors of the Exchange declare a dividend to the Subscribers out of the profits earned by the Exchange during the year 1954 in the sum of $103,855.73.

BE IT FURTHER RESOLVED that in order to build up the surplus of the Exchange each Subscriber respectively contribute to the Attorney-in-fact of the Exchange 75% of the dividends paid such Subscriber for the year 1954 in order that the Attorney-in-fact may be in a position to contribute to the Exchange as additional surplus the amount of such contribution.

At a meeting of the board of governors on February 26, 1955, the following resolution was adopted:

Be it Resolved that from the profits earned by the Exchange in the year 1954 a dividend be declared in the aggregate sum of $103,855.75 to the Subscribers in direct proportion to which the premiums paid by the Subscribers during said year contributed to said profit, after first deducting from each individual Subscriber's dividend the losses paid by the Exchange to said Subscriber during said year.

At this same meeting of the board of governors it was reported that the attorney in fact, Commercial Fishermen's Fraternal Society, Inc., had indicated its willingness to contribute an additional $75,000 to the surplus of the Exchange and a resolution was adopted that this contribution be made and a certificate of contribution issued to the attorney in fact.

At a meeting of April 5, 1955, the board of governors adopted the following resolution:

Be it resolved that the secretary be instructed to make the necessary legal arrangements to issue some evidence, like a Certificate of Indebtedness, to each policyholder since inception, for the amount of contribution contributed to the Fraternal Society. It is the intent of this resolution to retire these evidences of indebtedness after the Exchange has a surplus of $500,000 over and above all of its liabilities, and then only if and when the Exchange and/or Fraternal Society can do so. It is understood that these notes or certificates will be paid in the order in which they were contributed. (First in first out).

At a meeting of the board of governors on February 24, 1956, a report was made by a member of the board that the California insurance commissioner had refused final approval of a contribution by members of the Exchange of 75 percent of any annual refund amount in order to increase the reserve to $500,000. The report further stated that the insurance commissioner had suggested that an immediate payment by petitioner of the final $100,000 still owing on the original $300,000 reserve fund, which amount was in the treasury and available, would be approved, and that the issuing of notes to members for the full amount of contributions made to and including 1954 at either 15 percent or 75 percent would also be approved in accordance with the following plan:

That until such notes were paid off, 80% of any annual refund should be paid to the boat owner and 20% retained for such payments as an outright contribution, not accruing as a credit to the account of any member boat. When all such notes had been paid in full, the members decide whether or not it was necessary or wise to build up a larger reserve.

To explain this decision and the future procedure approved of, it was pointed out that a reserve fund of more than $300,000.00 is not necessary, or recommended at present. Also, that no reason now exists to continue building up

larger contribution accounts to be repaid at a later date and that it is to the best interests of the members to immediately set up a program that will refund this money to them within a reasonable time and while so doing guarantee the refund of 80% of annual net earnings to each and every member entitled to a refund. The remaining 20% to be used to close out existing contribution credit accounts.

At a meeting of the subscribers on February 25, 1956, a resolution that the balance due on the original certificate of contribution be retired immediately was adopted, this resolution also containing provisions in accordance with the plan which had been set forth by the board of governors at its February 24, 1956, meeting.

At a meeting of the board of governors on February 15, 1957, a member of the board explained the delay encountered in getting the certificate of indebtedness as approved at the subscribers' meeting in 1956 from the California State insurance commissioner's office and stated that "it may now become necessary to secure a written statement from older members and former Board members, stating it was always the understanding and intention to return contributions made by members to and including 1954 as soon as funds were available for this purpose."

At a meeting of petitioner's board of governors on June 22, 1957, a representative of the California Department of Insurance was present to answer questions of board members and after discussion in this meeting the following resolution was adopted:

BE IT RESOLVED,

First: That the balance due on the original Certificate of Contribution be retired as soon as the surplus is $300,000.00.

Second: That an application be made to the Department of Insurance to issue a new Certificate of Contribution for the years 1952 through 1954 to subscribers who contributed 75% through these years indicated, and only in an amount of the excess contributed over 15%. This amount to be approximately $107,280.00, which represents four-fifths (60% of total premium refunds) of approximately $134,100.00.

Third: That the application be accompanied by a detailed list of Contributors, showing the amount due each contributor for these years indicated (1952 through 1954).

Fourth: That the contributions of the subscribers in the amount of 15% on their dividends for the years 1945 through 1954 and 20% for the year 1955 be treated as free surplus by the Exchange, and that some evidence be given to show this interest in the surplus. That each year hereafter the subscribers will contribute 20% of their dividends into surplus fund until otherwise directed by the Board of Governors. That no note or certificate of indebtedness shall be issued for the contributions to surplus for the 15% and 20% contributed. That the subscribers shall not be entitled to make claim for any of the paid-in surplus until the Exchange is dissolved or otherwise terminates doing business, and then they shall only be entitled to a pro-rata share of the surplus after all of the debts and obligations of the Exchange have been satisfied.

Fifth: That the necessary approval be obtained from the Department of Insurance covering the change in the By-Laws that were amended at a previous Annual Meeting to the effect that the By-Laws could be amended by a sixty-six and two-thirds percent vote, instead of three-fourths as before.

Preceding the adoption of this resolution, the representative of the California Department of Insurance had stressed the necessity of petitioner's acquiring surplus which was "free surplus" and had criticized petitioner's practice of continually getting in new money to pay off old money. The representative of the department of insurance suggested that petitioner apply to the department of insurance for authority to issue certificates of contribution.

On January 12, 1959, petitioner filed an application with the Department of Insurance of the State of California to issue certificates of contribution in accordance with the resolution adopted at the board of governors meeting of June 22, 1957, with respect to the 60 percent of dividends received during the years 1952 to 1954 and dissolution certificates for the 15 percent contributions from 1946 to 1952, and the remaining 15 percent of the contributions from 1952 through 1954, the contribution certificates to be repaid at a future date and the dissolution certificates to show that they would be paid upon dissolution of petitioner out of assets remaining after the payment of all liabilities and obligations of petitioner but otherwise were not to be an obligation of petitioner.

At a meeting of the subscribers on January 24, 1959, a resolution was passed, ratifying and approving the application filed with the Department of Insurance of the State of California on January 12, 1959, and the plan set forth therein, and rescinding and repealing all resolutions of petitioner's board of governors or subscribers inconsistent therewith. This resolution also provided:

RESOLVED FURTHER, THAT THIS meeting hereby declares that it was always the intention and belief of the members of this Exchange that a portion of the contributions to surplus from dividends made by the subscribers to the Exchange would, at some future date, be returned to the said subscribers.

The issuance of certificates of contribution and dissolution certificates by petitioner was approved, and such certificates were actually issued.

It was petitioner's practice in the years here involved to deduct and retain from an individual subscriber's share of declared net earnings an amount equal to the loss or losses, if any, incurred under the policy covering such subscriber to the extent such loss or losses did not exceed the amount to which the subscriber would be entitled if no loss had been incurred under his policy. The deduction for losses claimed by petitioner on its tax return in each of the years here

involved included the amounts which were subsequently recovered by petitioner through these retentions. These retentions, which are sometimes referred to as "loss retentions" totaled the following amounts and were reported on petitioner's returns as follows:

| Loss retentions | Retained with respect to distribution declared out of earnings for the year | Amount of loss retentions reported as income in tax return for the year |
|---|---|---|
| $1,641.76 | 1950 | 1951 |
| 9,768.21 | 1951 | 1952 |
| 10,340.71 | 1952 | 1953 |
| 13,125.74 | 1953 | 1954 |
| 26,375.65 | 1954 | 1955 |
| 8,538.99 | 1955 | 1956 |

In each year here in issue, after the adoption of the resolution that the net savings of earned premium be paid to subscribers, the amount earmarked by such resolution to be contributed to petitioner was placed in petitioner's sinking fund for retirement of outstanding certificates of contribution. The remaining portion of the amount stated as a declared dividend was paid in cash to the subscribers in the year following the year of the earning thereof.

On its books of account (for the years 1946 through 1954) petitioner set up the total of the year's net earnings on premiums in an account entitled "Subscribers Refunds Payable." This account was the only account used for setting up the liability of petitioner for dividends declared and unpaid. The balance of such account on January 1, 1950, was zero; no dividends were declared and unpaid at that time. The only amounts credited to such account during the years in issue were amounts corresponding to the amounts deducted in the year's Federal income tax return as subscribers' refunds.

It was the practice of petitioner to prorate to individual subscribers their respective shares of the year's net earnings on premiums in the ratio which the premium earned by the individual subscriber bore to the total premiums earned by all subscribers, and petitioner maintained a form entitled "Refund Card" with respect to each subscriber. On this form in the column entitled "Gross Refund" was entered the individual subscriber's share of the year's net earnings on premiums for a particular year. In the column entitled "Withheld Acct. Loss" was entered the loss retention, if any, applicable to the subscriber and in the column entitled "Contributed" was entered the individual subscriber's share of the amount authorized to be applied in retirement of the certificate of contribution.

For each of the years here involved petitioner filed with the Internal Revenue Service a Form 1099 on which it reported under a designation "Patronage Dividends, Rebates, or Refunds (100 or more)" with respect to each individual subscriber, the amount shown on his refund card as gross refund. In determining the 15 percent or 75 percent of contributions, petitioner in those instances in which there had been an amount withheld on account of loss, deducted such amount from the particular subscriber's gross refund before applying thereto the percentage to be retained as contribution thereto. The total amounts credited to subscribers' refunds payable account and the year of the earnings with respect to which the credits were made, although the posting occurred in the following year, are as follows:

| Year of earnings | Amount credited | Year of earnings | Amount credited |
|---|---|---|---|
| 1950 | $14,457.44 | 1954 | $103,855.73 |
| 1951 | 51,746.52 | 1955 | 40,637.20 |
| 1952 | 45,839.00 | 1956 | None |
| 1953 | 73,614.32 | 1957 | None |

The formation of petitioner enabled its subscribers to insure their fishing vessels at a rate ranging from 8 percent to 10 percent of the vessel's value before any refund to them by petitioner, whereas rates of insurance on fishing vessels from insurance companies ranged as high as 15 percent of a vessel's value.

Petitioner's excess profits credit for the years 1950, 1951, and 1952, without any adjustment for interest on borrowed capital, and without taking into consideration the excess profits credit carryover from one year to another, is $34,258.61, $36,881.07, and $27,676.90, respectively.

Petitioner is a small company and is the only marine reciprocal insurance exchange in the United States. It customarily reinsures with other insurance companies 80 percent of the risks on which it is the primary insurer, and it pays a premium for such insurance. During the period February 1, 1956, to January 1, 1957, petitioner had reinsured a portion of its risks with a French insurance company by the name of Societe Nord-African de Reassurances (hereinafter referred to as SNAR). During this period petitioner suffered losses, four of which were reinsured with SNAR for approximately $55,000. Petitioner recovered a portion of this claim by offsetting a premium owed to SNAR, leaving a claim against SNAR in the amount of $53,219.63. Petitioner first learned that SNAR was in financial difficulties in 1956 when it sent in a claim for one of its losses covered by a SNAR reinsurance policy and was informed by SNAR that due to some difficulties the company was not able to honor the claim at that time.

In September or October 1956, petitioner was advised by its reinsurance broker that it had information that SNAR was in very bad financial difficulties and that according to information which had been received by that broker from its London principal the liabilities and capital of SNAR indicated that for all intents and purposes SNAR was bankrupt. Subsequent to October 1956, petitioner attempted to locate assets of SNAR in the United States and elsewhere which it could attach. Petitioner made a number of inquiries in 1957 with respect to assets in the United States but did not locate any such assets.

In the spring of 1957 it employed a representative to go to Canada in an attempt to locate SNAR assets. Some Canadian assets were located but petitioner learned that these assets were available only for Canadian creditors. In the latter part of 1957 petitioner retained legal counsel to attempt to recover funds from SNAR in payment of its claim. In early 1958 the counsel retained by petitioner engaged Canadian counsel to institute a suit in an attempt to recover on petitioner's claim against SNAR. Such a suit was instituted but subsequently dismissed because in the opinion of the Canadian counsel, petitioner had no claim recognizable under Canadian law and to proceed with the suit would be costly.

In July 1958 petitioner, through its counsel, engaged a French attorney to attempt to recover, through the liquidator of SNAR in France. Later in 1958 the French attorney was instructed to do nothing more on the matter. Subsequently, in 1960 or 1961, the French attorney wrote petitioner to the effect that he could arrange a settlement with the liquidator of SNAR in the amount of $17,000. Thereafter, petitioner's general manager went to France and concluded a settlement with SNAR in 1961 from which petitioner received in that year $17,000 in consideration of a release of all claims against SNAR.

Petitioner on its income tax returns for the years 1951 through 1956 claimed deductions in the following amounts as distributions declared to its subscribers out of earnings of the current year:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1951 | $51,746.52 | 1954 | $107,403.87 |
| 1952 | 45,839.00 | 1955 | 40,637.20 |
| 1953 | 80,087.26 | | |

On its Federal income tax return for the year 1957 petitioner claimed a net operating loss in the amount of $7,958.22 and in determining this loss it deducted a writeoff of reinsurance recoverable in the amount of $53,219.63 which represented petitioner's claim of amounts owed to it by SNAR. This item was reported at item 20 of petitioner's 1957 tax return, the printed legend of which is "Bad debts (Sched-

ule F)," after which was typed at item 20 "(Reinsurance recoverable) $53,219.63."

Respondent in his notice of deficiency disallowed deductions claimed for refunds to subscribers in the amount of $5,736.90 for the year 1952, $24,583.16 for the year 1953, $41,835.65 for the year 1954, and $77,539.16 for the year 1955 with the following explanation as to each year except that for the years 1954 and 1955 the reference is to the Internal Revenue Code of 1954:

It has been determined that the claimed deduction for dividends and/or refunds to subscribers is not allowable within the purview of the Internal Revenue Code of 1939 to the extent of the earnings retained.

The issue with respect to the loss carryback for the year 1955, thereby raising the issue of the deductibility of the $53,219.63 claim against SNAR in the year 1957 was raised by petitioner in its amended petition. Various allegations including concessions have been made by each party, so that their respective claims of the appropriate amounts deductible by petitioner as dividends to subscribers in the years 1950 through 1957 are now as follows:

| Year | Amount petitioner claims to be deductible | Amount respondent concedes to be deductible |
|---|---|---|
| 1950 | $14,457.44 | $10,893.32 |
| 1951 | 51,746.52 | 35,681.56 |
| 1952 | None | None |
| 1953 | 45,839.00 | 8,874.57 |
| 1954 | 73,614.32 | 15,122.14 |
| 1955 | 103,855.73 | 19,370.02 |
| 1956 | 32,509.76 | 32,509.76 |
| 1957 | None | None |

Petitioner also contends that if it is not entitled to deduct as dividends declared amounts retained by it as loss retentions, then the additions of these amounts to its income in the years following the claimed deductions as losses recovered should be eliminated.

### OPINION.

The first issue for decision is the amount of dividends declared by petitioner in each of the taxable years 1950 through 1955, which is deductible under the provisions of section 204(c)(11) of the Internal Revenue Code of 1939 and section 832(c)(11) of the Internal Revenue Code of 1954.[1] Both parties agree that petitioner's taxable income for

---

[1] Sec. 204(c)(11), I.R.C. 1939, provides as follows:

(c) DEDUCTIONS ALLOWED.—In computing the net income of an insurance company subject to the tax imposed by this section there shall be allowed as deductions:

\* \* \* \* \* \* \*

(11) Dividends and similar distributions paid or declared to policyholders in their capacity as such, except in the case of a mutual fire insurance company described in paragraph (1) of subsection (a) of this section. The term "paid or declared" shall be construed according to the method of accounting regularly employed in keeping the books of the insurance company.

Section 832(c)(11) of the Internal Revenue Code of 1954 contains the same provision.

1953 and prior years should be computed under the provisions of section 204 of the Internal Revenue Code of 1939 and for 1954 and subsequent years under section 832 of the Internal Revenue Code of 1954. They also agreed and have so stipulated "that the dividends deductible in any year are the dividends actually declared in that year." Therefore, our question is limited to the narrow issue of the amount of dividends declared by petitioner in each year here involved.

Respondent recognizes that in each year other than 1952 some dividends were declared and petitioner is not now claiming a dividend deduction for the year 1952. It is respondent's position that inherent in each of the resolutions both of the board of governors of petitioner and of its subscribers declaring dividends for each of the years 1950 through 1956 [2] is the declaration only of the earnings in excess of the amounts retained by petitioner as loss retentions and as contributions. Respondent makes no argument that for the years in which the resolution referred only to the pro rata net savings of earned premiums for the year as shown by the books of account instead of to a specific dollar amount, the declaration was too indefinite to create any liability. Respondent also recognizes that the word "declared" as used in the statute is the governing word with respect to petitioner, an accrual basis taxpayer, and that if a dividend has been declared so as to become an indebtedness or accrued liability of petitioner's the statutory requirement is met irrespective of when or how the liability is paid.[3] While petitioner argues that in effect respondent is treating it as a cash basis taxpayer and permitting it to deduct only dividends paid, we do not so understand respondent's argument. The amounts

---

[2] The year 1956 is involved solely because of the necessity of proper computations of carrybacks.

[3] Respondent in Rev. Rul. 57–134, 1957–1 C.B., 210, specifically recognized that under the governing income tax regulations (sec. 1.823–2) an accrual basis insurance company may deduct in the year of declaration dividends paid in a subsequent year to policyholders where the dividends are declared as an amount representing all or a portion of the net profits of the company as of the end of the taxable year with the following explanation:

"The question in the instant case then is whether such dividends declared by the company were in a determined or an undetermined amount. Dividends of the type involved in the instant case cannot create a debt at the time the resolution therefor is adopted by the board of directors, because losses may occur during the remainder of the year which would more than offset the corporation's prior earnings for such year. Thus, under such a resolution, no debt between the corporation and the policy-holders can be created until the taxable year has closed, since only then would it be clear whether there were earnings available for the purposes of the dividend declaration.

"At the end of the taxable year during which the dividend is declared, pursuant to a resolution of the board of directors, however, all events will have occurred which fix the company's liability for the dividend and such liability cannot be affected by anything transpiring after that time. See *United States* v. *P. Chauncey Anderson et al.,* T.D. 3839, C.B. V–1, 179 (1926) ; *Uncasville Mfg. Co.* v. *Commissioner,* 55 Fed. (2d) 893, certiorari denied 286 U.S. 545 and *Anderson-Clayton Securities Corp.* v. *Commissioner,* 35 B.T.A. 795, acq. C.B. 1937–2, 2. Thus, such a declaration may be treated as an accrued liability for the taxable year during which the resolution therefor is adopted by the board of directors, provided there are sufficient earnings for such year available for dividends at the close of the taxable year and the dividends would be deductible in the year in which declared since the resolution would satisfy the requirements of sections 1.823–2 and 1.832–2 of the Income Tax Regulations."

which respondent recognizes as deductible do correspond with the amounts paid to petitioner's policyholders in cash in some instances in the year following the year of declaration and in other instances in the same year in which declared but this is solely for the reason that petitioner did pay over either in the year following the year of declaration or in the year in which the dividend was declared in cash to its policyholders the amounts not retained by it as loss retentions or contributions. Respondent's position is that the declaration of the dividends in each of the years here involved did not cause petitioner to become unconditionally indebted to the policyholders for the full refund but only for the amounts which were thereafter paid to the policyholders in cash.

In our finding we have set forth the various resolutions passed at the annual meetings of petitioner's subscribers and by its board of governors. The resolution adopted at the first annual meeting of the subscribers on September 22, 1946, and insofar as the record herein shows in effect throughout all the years here involved provided unequivocally for the retention by petitioner of the amounts of the loss retention. In accordance with this resolution a policyholder who had sustained a loss never became entitled to that extent to the earnings on premiums for the year of such loss. For this reason there existed at no time a liability of petitioner to pay such amount to the policyholder and such amount was not declared as a dividend. "To constitute a valid declaration, the resolution must by its terms create a binding and enforceable obligation on the part of the corporation to pay." *Lockhart Iron & Steel Co.* v. *O'Toole*, 22 F. Supp. 919 (W.D. Pa. 1938). Cf. *Royal Mfg. Co.* v. *Commissioner*, 130 F. 2d 958 (C.A. 3, 1943), affirming a Memorandum Opinion of this Court. To the extent of the loss retentions applicable to each of the years here involved no dividend was declared within the meaning of section 204(c)(11) of the Internal Revenue Code of 1939 and section 832(c)(11) of the Internal Revenue Code of 1954.

Petitioner contends that if the amounts of loss retentions are not properly deductible as dividends declared, such amounts are not income to petitioner in the year actually withheld and that petitioner's reporting of them as income in such year is in error. Respondent disputes this contention of petitioner with no argument except to state that such adjustment is not required. We agree with petitioner that except for its deduction of the amount of these loss retentions in the year of the earnings to which they were applicable there would be no basis for including the amounts thereof in income in the following year. Therefore, we sustain petitioner in its contention that its income in each of the years here involved should be reduced by the amount of the loss retentions reported by it as income from retirement fund losses retained.

A much more difficult question arises with respect to the amounts retained by petitioner as contributions. If the legal effect of the resolutions is that the subscribers are entitled to the dividend, part to be paid in cash and part at a future date, we agree with petitioner that the declaration creates an indebtedness and is thus a dividend declared. Cf. *Lockhard Iron & Steel Co.* v. *O'Toole, supra.*

The resolutions on their face with respect to earnings for the years 1946 through 1954 [4] are ambiguous as to the rights of the subscribers with respect to the contributions when the certificates of contribution given by petitioner to its attorney in fact had been paid. As pointed out in *Order of Railway Employees*, 2 T.C. 607, 615, (1943), where there is no capital stock, the members of a corporation or as here an unincorporated association, are entitled to all dividends either at some earlier time or upon dissolution. The difficulty, of course, is that the individual equity of each subscriber might be equal or prorated in some manner other than a recognition of his contributed interest or a subscriber withdrawing before dissolution might not be entitled to any share. Cf. *Order of Railway Employees, supra* at 616. A comparable problem arises in the case of cooperative crediting patronage rebates or "dividends" to members by certificates evidencing an equitable ownership therein. Cf. *United Cooperatives, Inc.*, 4 T.C. 93, 108 (1944), and *Colony Farms Cooperative Dairy, Inc.*, 17 T.C. 688, 694 (1951).

If we accept the resolution passed by the subscribers in 1959 as properly interpreting the resolutions passed with respect to earnings for the years 1946 through 1954, it was always the intention that the 15 percent and 75 percent contributions be repaid to the subscriber when the certificates of contribution to the attorney in fact had been paid off. How it was hoped to accomplish this result in any reasonable period of time except by dissolution when earnings on premiums continued to be distributed and petitioner's other income would, of course, be minor in comparison to such earnings, apparently was of concern to the California Insurance Department. However, if at the time the resolution declaring the dividend was passed, it was recognized that its payment would have to await dissolution, as long as it represented a recognized equity interest of the particular subscriber in assets upon dissolution as distinguished from his general interest in such assets as a member, it would not necessarily follow that the simultaneous declaration of the dividend and contribution thereof back to petitioner caused the declaration not to be valid. Cf. *R. H. Bouligny, Inc.*, 45 B.T.A. 456 (1941), and *Samuel Goldwyn*, 9 T.C. 510 (1947), affd. 175 F. 2d 641 (C.A. 9, 1949).

---

[4] The resolution adopted in 1955 dealt with the 1954 earnings and apparently was considered by petitioner up to the time of trial as being a dividend declared in 1954.

We think the proper interpretation of the resolutions of the subscribers and board of governors, viewed in the light of their wording as well as subsequent action with respect thereto, is that upon declaration of the earnings as dividends petitioner became indebted in the amount thereof, except as to the loss retentions, to the subscribers and that the payment was partially by cash and partially by setting up a credit in the subscriber's account as a contribution to petitioner with the subscriber's consent and with the understanding that this amount would be at some future date paid to the subscriber or recognized as a portion of his equitable interest should petitioner cease business. As early as 1952 there appeared in the minutes of meetings of the board of governors concern as to the individual subscriber's interest being built up by his contributions. The records of petitioner showed the amounts of these contributions as owed to the individual subscriber. All indications are that both the subscriber and petitioner recognized the amounts of the contributions as true obligations of petitioner to the individual subscriber. We, therefore, sustain petitioner with respect to deductions of the dividends declared in the year of declaration except for the adjustment for loss retention.

Petitioner's major argument with respect to the $53,219.63 claim for insurance against SNAR which it contends is deductible in the year 1957 is that it is a loss incurred within the meaning of section 832(b)(5) of the Internal Revenue Code of 1954.[5] Section 832(b)(5) defines losses incurred to mean losses computed by adding to losses paid during the taxable year salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deducting salvage and reinsurance recoverable outstanding at the end of the taxable year, and to the result so obtained adding all unpaid losses at the end of the taxable year and deducting unpaid losses outstanding at the end of the preceding taxable year. Since the claim of petitioner against SNAR for reinsurance recoverable arose in 1956, it appears to us under this provision of the Code that this amount was outstanding at the end of 1956 since it arose during that year and would therefore be added to losses paid by petitioner during the taxable year 1957 and deducted as outstanding reinsurance recoverable at the end of 1957 unless, as petitioner argues as an alternative, it had become a bad debt during the year 1957 and thus should be charged off.

We have set forth the facts with respect to petitioner's claim against SNAR. These facts show that at the end of 1957 petitioner was still

---

[5] Sec. 832(b)(5). LOSSES INCURRED.—The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

(A) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

(B) To the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

attempting to collect the claim against SNAR both in Canada and through the liquidator in France and that there was no reasonable basis at the end of 1957 for a determination of what amount, if any, of the SNAR loss was uncollectable. *Teitelbaum* v. *Commissioner*, 294 F. 2d 541 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court, certiorari denied 368 U.S. 987; *American Equitable Assurance Co. of N.Y.* v. *Helvering*, 68 F. 2d 46 (C.A. 2, 1933), affirming a Memorandum Opinion of this Court; and *W. A. Dallmeyer*, 14 T.C. 1282 (1950). We sustain respondent in his position that the $53,219.63 of reinsurance claimed by petitioner from SNAR is not deductible by petitioner in computing its 1957 net operating loss carryback to the year 1955.

The final issue is whether this Court has jurisdiction with respect to respondent's claim for increased deficiencies resulting from adjustments contended for by respondent in determining the excess profits credit carryovers of petitioner for the years 1950 and 1951 to the years 1952 and 1953. Until a recomputation under Rule 50 is made we cannot determine whether any increased deficiencies for 1952 and 1953 will result under the allegations, including the alternative allegations, made by respondent in his amended answer because of decreased excess profits credit carryovers from 1950 and 1951. This will be effected by concessions and agreements of the parties as well as our disposition of the other issues herein. If such increased deficiencies do in fact result, we agree with respondent that this Court has jurisdiction to determine such increased deficiencies. We think it clear that section 430 of the Internal Revenue Code of 1939 deals with the imposition of an additional income tax on excess profits net income. As respondent contends, the words of the statute are clear in this regard since section 430(a) provides:

In addition to other taxes imposed by this chapter, there shall be levied, collected, and paid for each taxable year ending after June 30, 1950, and beginning before January 1, 1954, upon the adjusted, excess profits net income, * * * of every corporation * * * an excess profits tax * * *

However, if the language were considered ambiguous, the reports of the Ways and Means Committee and the Senate Finance Committee with respect to the enactment of the Excess Profits Tax Act of 1950 make it clear that this interpretation is the proper one.[6]

Section 430 of the Internal Revenue Code is a part of chapter I of the 1939 Code and section 272(a) of the Internal Revenue Code

---

[6] H. Rept. No. 3142, 81st Cong., 2d Sess., 1951-1 C.B. 189.

"The excess profits tax provided by this bill is computed as an additional tax over and above the corporate income tax. The consolidated return privilege is made available as in the World War II statute. In general the computation of the excess profits tax is as follows :

* * * * * * *

"Under the World War II excess profits tax the so-called "two-basket" approach was followed. The corporate income tax was imposed only on income which was not subject to

of 1939 refers to the determination of a deficiency "in respect of the tax imposed by this chapter." In *Union Telephone Company*, 41 B.T.A. 152 (1940), we held that from "the structure of the statute it appears that the normal tax and the undistributed profits tax are to be considered as but parts of the income tax imposed by Title I in so far as the determination of deficiencies or overassessments is concerned." The same is true for the same reason of the income tax and excess profits tax imposed by chapter I of the Internal Revenue Code of 1939. Cf. *Citizens Mutual Investment Association*, 46 B.T.A. 48 (1942).

We hold that this Court has jurisdiction to determine any increased deficiencies for 1952 and 1953 that arise from a recomputation of the unused excess profits credit carryover from 1950 and 1951 in accordance with the agreements and concessions of the parties and our decision herein.

Petitioner argues that it is entitled to net operating loss carrybacks from 1955, 1956, and 1957 to 1953, 1954, and 1955. We do not understand respondent to contend to the contrary except insofar as he contends that no such net operating losses were sustained in those years. The appropriate adjustment for such net operating losses, if any, may be made under Rule 50.

*Decision will be entered under Rule 50.*

---

the excess profits tax and the excess profits tax (comparable to the 75 percent tax referred to above) was imposed on income in excess of the excess profits credit.

"Substantially the same tax burdens are achieved under either type of computation, but the type used in this bill is believed to be the simpler. Under this approach the income tax can be computed without regard to the excess profits tax, and subsequent adjustments in the excess profits credit will not require a recomputation of the income tax. Also, the method provided in this bill permits the complete consolidation of returns and procedures for assessing and collecting the income tax and the excess profits tax, which should reduce substantially the burden of administration and taxpayer compliance. Under the proposed provisions the income tax and the excess profits tax would be treated as one tax for the purpose of the computation of interest on refunds or deficiencies, the statute of limitations, credit and refund, the sending of 90-day letters, etc."

S. Rept. No. 2679, 81st Cong., 2d Sess. 1951–1 C.B. 242, 243.

"The excess profits tax provided by your committee's bill is computed as an additional tax over and above the other corporate income taxes. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"This is the same approach as was used under the House bill. Under the World War II excess profits tax the so-called "two-basket" approach was followed. The corporate income tax was imposed only on income which not subject to the excess profits tax, and the excess profits tax (comparable to the 77 percent tax referred to above) was imposed on income in excess of the excess profits credit.

"Substantially the same tax burdens are achieved under either type of computation, but the type used in your committee's bill and in the House bill is believed to be the simpler. Under this approach the other income taxes can be computed without regard to the excess profits tax, and subsequent adjustments in the excess profits credit will not require a recomputation of the other income taxes. Also this method permits the complete unification of procedures for assessing and collecting the other income taxes and the excess profits tax, which should reduce substantially the burden of administration and taxpayer compliance. Under the provisions of your committee's bill and the House bill the income tax and the excess profits tax will be treated as one tax for the purpose of the computation of interest on refunds or deficiencies, the statute of limitations, credit and refund, the sending of 90-day letters, etc."