IRVIN WEISBART AND LETTY WEISBART, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8926–80.    Filed September 23, 1982.

*Gilbert Goldstein* and *Philip Munishor*, for the petitioners.
*Glenn D. Wilkinson*, for the respondent.

GOFFE, *Judge*: The Commissioner determined a deficiency in
the petitioners' Federal income tax for the taxable year ended
August 31, 1974, in the amount of $147,085.

The issue for decision is whether petitioner Irvin Weisbart
received stock of Weisbart Enterprises, Inc., in excess of his
proportionate share of property transferred to Weisbart Enter-

prises, Inc., pursuant to a section 351 exchange and, if so, whether he recognized taxable income as a result of this disproportionate receipt.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated herein by this reference.

Petitioners Irvin and Letty Weisbart, who are husband and wife, filed a joint Federal income tax return for the taxable year ending August 31, 1974. They resided in Denver, Colo., at the time that they filed their petition in this case. Our references to petitioner in the singular will refer to Irvin Weisbart, as it is his business dealings with which we are concerned.

The petitioner is in the cattle business. He started with his father, Sam Weisbart, and his two brothers, George and Harry Weisbart. Their livestock business was a corporation known as Weisbart & Co. Weisbart & Co. operated as a cattle and hog feeder. Years later, when Weisbart & Co. was owned and operated by the three brothers, Gary Weisbart (Gary), son of George Weisbart, formed his own incorporated cattle business, G. Weisbart & Co. The petitioner's business, Weisbart & Co., operated in Colorado. Gary's business, G. Weisbart & Co., operated in Texas and New Mexico. The petitioner's father and two brothers had passed away by the early 1970's, and the petitioner owned 100 percent of the stock of Weisbart & Co.

The petitioner and his brother George acquired 90 percent of Sigman Meat Co. (Sigman) in about 1960. Sigman is a sausage manufacturer that slaughters hogs and processes pork products. The 10 percent that was held by an outsider was eventually acquired by their sister, Tillie Kirschbaum (Tillie), so that each brother held 45 percent of the stock and Tillie held the balance of 10 percent. Some time later, George died, and his share was held in trust for his wife, Mildred, and their three children, Gary, John, and Dennis Weisbart, so that immediately prior to the events with which we are concerned, the Sigman stock was held as follows:

Irvin Weisbart ............................... 45 percent
Estate of George Weisbart, in Trust:
    Mildred Weisbart ........................... 15 percent

| | |
|---|---|
| Gary Weisbart | 15 percent |
| John Weisbart | 7½ percent |
| Dennis Weisbart | 7½ percent |
| Tillie Kirschbaum | 10 percent |

The corporations of the petitioner and Gary Weisbart, Weisbart & Co. and G. Weisbart & Co., formed a partnership which they later incorporated as Weisbart & Weisbart, Inc. (W & W), so that each corporation held 50 percent of the stock of W & W. W & W owns and operates a farm near Alamosa, Colo., and raises crops, cattle and hogs and feeds both cattle and hogs.

Sometime in 1971, the petitioner began making plans for the formation of a holding company to be known as Weisbart Enterprises, Inc., to which he would transfer his stock in Weisbart & Co., and both he and Tillie would transfer their stock in Sigman. It was intended that this transfer would qualify for nonrecognition under section 351. It was also thought that the Estate of George Weisbart might wish to transfer its 45 percent of Sigman into the new holding company.

Gary Weisbart, operating out of Texas and New Mexico, decided sometime in the early 1970's to expand to develop an integrated operation. He bought an incorporated packing house in Texas, Caprock Packing, and he set up a corporation to process and distribute meat, 7A Meat Co. Gary Weisbart also controlled 7A Land & Feed Co., a corporation which operated a custom feeding lot in New Mexico.

When Gary expanded his operations, he anticipated generating profits within the first 6 months of operations. The time that Gary chose for this expansion, however, corresponded with a downturn in the cattle market which, when coupled with his expansion, put Gary in financial trouble.

One of Gary's corporations, 7A Meat Co., which processed and distributed meat, used W & W as a source of its cattle. 7A Meat Co. was having trouble in the depressed beef market and was short of funds. It accumulated an account payable in the amount of $890,000 to W & W for cattle purchases. W & W expensed $630,000 of this amount in its provision for doubtful accounts in its taxable year ended January 31, 1973, and similarly expensed the remaining $260,000 in its taxable year ended January 31, 1974.

The table on page 525 summarizes the relevant holdings of the Weisbart family immediately prior to the negotiations described *infra*.

Sometime before 1974, the petitioner, Gary, Tillie, and the beneficiaries of the trust created by the Estate of George Weisbart began talking about the creation of a holding company that would hold the stock, not only of Sigman and Weisbart & Co., but also of W & W and 7A Land & Feed Co. The plan was for the various parties to contribute their stock in these corporations to a new corporation, Weisbart Enterprises, Inc., and receive in exchange stock in this new corporation equal to the fair market value of the property which they contributed. The starting point for determining the fair market value of the stock contributed would be the book value of the corporations, adjusted for deferred tax liabilities. The purpose of the plan was to provide a means for providing centralized management and reduce the operating overhead costs of these various cattle-related enterprises.

The book value of the corporations whose stock was to be contributed to the new corporation, as adjusted for deferred tax liabilities, was determined by the parties' accountant, Sam Butler, a tax partner in the accounting firm of Touche, Ross & Co., to be as follows as of October 31, 1973:[2]

| | |
|---|---|
| Sigman | $1,800,000 |
| Weisbart & Co | 6,140,000 |
| W & W | 3,000,000 |
| 7A Land & Feed Co | 165,000 |

Weisbart & Co. traditionally made good profits. Although the entire cattle industry was depressed from time to time, Weisbart & Co. did very well in good times and suffered relatively less in bad times. Weisbart & Co.'s net earnings after taxes and earnings per share for the 4 years preceding the formation of the holding company were as follows:

| | Net earnings | Earnings per share |
|---|---|---|
| Year ended Mar. 31, 1970 | $808,798 | $36.21 |
| Year ended Mar. 31, 1971 | 483,016 | 21.63 |

---

[2]These figures are as rounded by the accountant.

TABLE 1

Year ended Oct. 31, 1972 ....... $706,145          $31.62
Year ended Oct. 31, 1973 .......  210,728            9.44

W & W's net earnings after taxes and earnings per share were as follows:

|  | Net earnings | Earnings per share |
|---|---|---|
| 7 months ended Jan. 31, 1972[1] .. | $87,519 | $8.75 |
| Year ended Jan. 31, 1973 ...... | 118,358 | 11.84 |
| Year ended Jan. 31, 1974 ...... | (419,494) | (41.95) |

[1] From commencement of operations.

Sigman's net earnings after taxes and earnings per share for 1973 and 1974 were as follows:

|  | Net loss | Net loss per share |
|---|---|---|
| 52 weeks ended Oct. 28, 1972 ... | ($314,694) | ($1,109) |
| 53 weeks ended Nov. 3, 1973 .. | (297,642) | (1,149) |

7A Land & Feed Co. was a custom feeder, that is, it owned a feed lot but did not own the cattle and simply charged a fee for this service. Its potential for profitability was limited, and it made very little profit.

Tillie's 10 percent in Sigman represented the swing vote in control of Sigman. Her 10 percent of the Sigman stock, together with either the petitioner's stock in Sigman or that of the estate, constituted a majority of Sigman stock. It was important for Sigman to participate fully in the plan so that the desired operating efficiencies could be obtained. With this in mind, Tillie insisted that the importance of her stock to the control of Sigman be reflected in the fair market value of her stock. Tillie was the petitioner's sister and he did not want to insist that she was not entitled to a premium, so the petitioner and Tillie submitted this dispute to their attorney, Gilbert Goldstein. Mr. Goldstein determined that Tillie was entitled to an increase in the value of her Sigman stock over book value in the amount of $103,000. This adjustment was subsequently made as a reduction in the amount of stock to be received by the petitioner from the new corporation and an increase in the amount of stock that Tillie would so receive, as the petitioner did not want to disturb anyone else's interest with this adjustment. Weisbart & Co. eventually acquired the 15 percent of Sigman stock held in trust for John and Dennis Weisbart. The petitioner and Tillie agreed on the valuation of

Tillie's Sigman stock at a time prior to when it was known whether or not John and Dennis Weisbart would choose to be bought out.

The petitioner also negotiated with Gary as to the value of their respective contributions to the new corporation. They determined, after extensive negotiations, that the petitioner's contribution was worth $440,000 more than Gary's contribution. They agreed that this adjustment would be made by increasing the book value of the petitioner's contribution by $220,000 and by decreasing the book value of Gary's contribution by $220,000. Although they considered many factors in arriving at this result, the primary factor was the superior earning power of Weisbart & Co. Weisbart & Co. was in a good financial position and historically made very good profits.

As part of their negotiations, the petitioner and Gary also decided to have W & W issue a $1 million dividend. The purpose of this was to provide Gary's corporation, G. Weisbart & Co., which held 50 percent of the W & W stock, $500,000 to pay corporate obligations owed by itself and its subsidiaries. The petitioner's corporation, Weisbart & Co., was also to receive $500,000 in this distribution. The petitioner decided to keep his $500,000 in his corporation, Weisbart & Co., and did not receive any distribution as a result of the W & W dividend. The book value of petitioner's interests in Weisbart & Co. and in W & W was unaffected by this dividend because Weisbart & Co.'s interest in W & W was included in Weisbart & Co.'s financial statements as an asset using the equity method of accounting, so that Weisbart & Co.'s value already included the $500,000 it was to receive from W & W.

There were two changes in economic interest that occurred sometime prior to the consummation of the transaction. Weisbart & Co. purchased, for $300,000, the Sigman stock held in trust for John and Dennis Weisbart, who chose to be bought out. In addition, Gary and the minority shareholder of 7A Land & Feed Co. transferred their shares in 7A Land & Feed Co. to G. Weisbart & Co. for stock in G. Weisbart & Co. with the effect that G. Weisbart & Co., rather than Gary and the minority shareholder of 7A Land & Feed Co., would contribute the 7A Land & Feed Co. stock and receive in exchange stock in the new corporation.

Once the parties agreed to these valuations, they left the

actual computations to their accountant, Sam Butler. Mr. Butler determined the number of new shares to be received by each shareholder based on the book value of his stock on October 31, 1973. This book value was increased by each shareholder's share of the deferred taxes for each corporation. The allocation of shares was also adjusted to reflect the agreement of the parties as to valuation. The book value of the shares that Tillie contributed was increased with a corresponding decrease in the book value of the shares that petitioner contributed. The book value of the shares the petitioner contributed was increased with a corresponding decrease in the book value of the shares that Gary contributed. This last adjustment was made by increasing the book value of the petitioner's Weisbart & Co. shares and decreasing the book value of Gary's W & W shares. The balance of the W & W shares, that is, those owned by Weisbart & Co., were to be eliminated because the value of Weisbart & Co.'s interest in W & W was already reflected in the book value of Weisbart & Co., as explained above. Therefore, the issuance of stock to Weisbart & Co. with respect to W & W would be duplicative. The stock which Weisbart & Co. would be entitled to for the contribution of its new holding in Sigman was also to be eliminated both because Weisbart & Co., a subsidiary of the new corporation, would in effect be an owner of itself, and because the value of Weisbart & Co. used by Mr. Butler in his calculation was determined on October 31, 1973, prior to Weisbart & Co.'s acquisition of the Sigman stock, and included the cash that was used to purchase the Sigman stock. This Sigman stock, then, was duplicative because its value was already included in the book value of Weisbart & Co.

Mr. Butler's calculations are summarized in the schedule on page 529 .

Mildred Weisbart hired an attorney who represented her and either John or Dennis Weisbart with respect to this transaction.

The trustees for the Estate of George Weisbart reviewed and approved the negotiated plan.

The negotiations among the parties culminated in a document entitled "Plan for Exchange of Stock Under Section 351 of the Internal Revenue Code" (the plan). The plan set forth the stock holdings of the various parties in Weisbart & Co.,

## VALUES USED IN DETERMINING STOCK ALLOCATIONS TO SHAREHOLDERS

| Corporation | Irvin Weisbart | Gary Weisbart | Mildred Weisbart | Tillie Kirschbaum | G. Weisbart & Co. | Wiesbart & Co. | Total | |
|---|---|---|---|---|---|---|---|---|
| Sigman | $810,000 | $270,000 | $270,000 | $180,000 | | $270,000 | $1,800,00 | (1) |
| W & Co. | [1]6,360,000 | | | | | | 6,360,000 | (2) |
| 7A Land | | | | | $165,000 | | 165,000 | (3) |
| W & W Inc. | | | | | 1,000,000 | 1,000,000 | 2,000,000 | (4) |
| Total | 7,170,000 | 270,000 | 270,000 | 180,000 | 1,165,000 | 1,270,000 | 10,325,000 | (5) |
| Percent of total | 69.44 | 2.62 | 2.62 | 1.74 | 11.28 | 12.30 | 100 | (6) |
| Values used in final allocation | $7,067,000 | $270,000 | $270,000 | $283,000 | $945,000 | $1,490,000 | $10,325,000 | (7) |
| Percent of total | 68.44 | 2.62 | 2.62 | 2.74 | 9.15 | 14.43 | 100 | (8) |
| Percent after elimination | 79.98 | 3.06 | 3.06 | 3.20 | 10.69 | --- | 100 | (9) |

*Explanation:*

Items (1) – (5)  Allocation of values using percentage of stock ownership. Values based on books, as adjusted. Stock ownership percentages are those percentages originally held.

Item (6)  Percentage of total as based on above (1) – (5) calculations.

Item (7)  Values as used for final allocation purposes. Values adjusted per agreement of the parties.

Item (8)  Percentage of total as based on item (7) allocations.

Item (9)  Percentages as finally adjusted to eliminate intercompany holdings (Weisbart & Co.).

[1]This amount includes the $220,000 increase.

Sigman, W & W, and 7A Land & Feed Co., whose stock was to be transferred to the new corporation. After declaring their intention to exchange this stock for stock in the new corporation, pursuant to section 351, the plan provided in relevant part as follows:

Now, THEREFORE, this plan and agreement of reorganization is hereby entered into in accordance with Section 351 and related sections of the Internal Revenue Code and the laws of the State of Colorado, to-wit:

1. The Stockholders agree to transfer to Enterprises all of the shares of stock hereinabove enumerated.

2. In consideration therefor, Enterprises agrees to exchange and transfer to the Stockholders the following number of shares of stock of Enterprises at the time and in the manner hereafter provided, as follows:

| Stockholders | Number of shares |
|---|---|
| Irvin Weisbart | 6844 |
| | |
| The First National Bank of Denver and Irvin Weisbart as coexecutors and co-trustees of the Last Will and Testament of George Weisbart, deceased. | |
| | |
| For the use and benefit of Mildred Weisbart | 262 |
| | |
| For the use and benefit of Gary Alan Weisbart | 262 |
| | |
| Tillie Kirschbaum | 274 |
| G. Weisbart & Co | 915 |
| Weisbart & Co | [3]1443 |

This allocation reflects the adjustments to the book value of the corporations made by Mr. Butler, including the valuation adjustments. The plan continued in relevant part as follows:

5. It is the intention of the parties that each of the stockholders will hold an equivalent percentage of the ownership in the parent corporation in terms of value as said stockholder owned in the combined value of the individual companies prior to the exchange of stock. The foregoing issuance is based upon the estimate of such percentages compiled by the accountants for the stockholders and Enterprises, Touche Ross & Co. It is understood and agreed that Touche Ross & Co., prior to the final adjustment date as hereinafter provided, do and prepare such accounting as Touche Ross.[sic]

---

[3]These shares were eventually eliminated as explained above.

shall deem necessary in order to determine the final values with reference to the foregoing exchanges. The exchanges shall be based upon the book value of the stock of each of the corporations in which the stockholders now own stock adjusted for deferred tax liabilities. Upon the issuance of a final evaluation by Touche Ross the shares of stock issued shall be adjusted in accordance therewith. The determination by Touche Ross concerning the accounting and the number of shares of stock to be issued shall be binding upon all of the parties thereto.

\*　　\*　　\*　　\*　　\*　　\*　　\*

6. The stockholders represent and warrant as follows:

\*　　\*　　\*　　\*　　\*　　\*　　\*

(d) That the stockholders will do all things necessary in order that no material changes in the financial condition of the corporations concerning which they will exchange stock prior to the exchange, except those changes arising in the ordinary course of business and except dividends payable by Weisbart & Weisbart, Inc. of a sum not to exceed $1,000,000 in the manner and form provided by proper resolution of the stockholders and directors of that company.

The plan was consummated in 1974 in accordance with its terms, so that the stock of Weisbart Enterprises, Inc., was distributed to the shareholders and in the amounts designated in the plan.

The table on page 532 summarizes the parties involved in the transaction and designates the entities that became subsidiaries of Weisbart Enterprises, Inc.

The petitioner, believing that he recognized no income on the occurrence of the events described above because of the operation of section 351, reported no income therefrom on his Federal income tax return for his taxable year ended August 31, 1974, which he filed jointly with his wife. The Commissioner, in his notice of deficiency for the petitioners' taxable year ended August 31, 1974, determined as follows:

(a) It is determined that you realized taxable income in the amount of $220,000.00 as a result of certain transactions involving your proportionate interest in certain property transferred in exchange for stock in Weisbart Enterprises Incorporated. Since this income was not reported on your return, your taxable income is increased $220,000.00.

## ULTIMATE FINDING OF FACT

The fair market value of Weisbart & Co. greatly exceeded its book value due in significant part to its potential for, and history of, earnings. Because of this, the petitioner did not

532

TABLE 2

[1] These percentages represent the relative interests of each shareholder in Weisbart Enterprises, Inc.
[2] These interests were eliminated as explained *supra*.

receive more than his proportionate share in the exchange at issue.

The stockholders of Weisbart & Co., Sigman Meat Co., Weisbart & Weisbart, Inc., and 7A Land & Feed Co. decided to consolidate these cattle-related businesses in order to provide centralized management and reduce operating overhead. This was to be done by contributing the stock of these corporations to a new corporation, Weisbart Enterprises, Inc., in exchange for stock in this new corporation.

In order to determine the fair market value of their contributions, and so determine how much stock in the new corporation each would receive in the exchange, the parties had their accountant determine the book value of the corporations and adjust this book value for the provision for deferred taxes. Using this as a starting point, the parties negotiated to determine the value of their contributions. These negotiations resulted in two major adjustments. First, Tillie insisted on an increase in the value of her Sigman stock because she held the swing shares with which the corporation could be controlled. The petitioner reluctantly agreed to an increase in the value of her shares in the amount of $103,000 as determined by their attorney, to whom they submitted their dispute. This $103,000 adjustment was made at petitioner's expense. Second, the petitioner and Gary agreed, after long and deliberate negotiations, that the value of the petitioner's contribution was worth $440,000 more than the value of Gary's contribution. This adjustment was to be made by increasing the petitioner's interest $220,000 and decreasing Gary's interest $220,000. These adjustments were given effect in the number of shares of the new stock that each shareholder would receive as calculated by their accountant, Sam Butler, and as incorporated in the plan which set forth the agreement of the parties. Mr. Butler, in his calculations, chose to make the $440,000 adjustment by increasing the value of Weisbart & Co.'s share of W & W by $220,000 and by decreasing the value of G. Weisbart & Co.'s share of W & W by $220,000. Weisbart & Co.'s share of W & W was destined to be eliminated because its value was already included in the value of Weisbart & Co. The

adjustment did have the effect of increasing the value of Weisbart & Co. by the amount of $220,000.

The issue for decision is whether the petitioner received stock of Weisbart Enterprises, Inc., in excess of his proportionate share of property transferred to Weisbart Enterprises, Inc., pursuant to the exchange, and, if so, whether he recognized taxable income as a result of this disproportionate receipt.

Before addressing this issue, we must consider two alternative arguments of the respondent. Both of these arguments are premised on respondent's perception that the plan provides for valuation of the contributions of the parties on the basis of book value as adjusted for deferred taxes and does not include the two negotiated adjustments.[4] Respondent argues that in this light, we should not consider any evidence other than the plan to determine the agreement of the parties.

In his first preliminary argument, the respondent argues that the plan is fully integrated and unambiguous and objects, on the basis of the parol evidence rule, to any other evidence of the agreement of the parties. The petitioner responds to this by maintaining that the contested evidence does not vary, modify, or contradict the agreement. The petitioner argues further that this Court has a liberal rule of admissibility of evidence when challenged on the basis of parol evidence.

This Court carefully reviewed the admissibility of evidence when challenged under the parol evidence rule in *Estate of Craft v. Commissioner*, 68 T.C. 249 (1977), affd. 608 F.2d 240 (5th Cir. 1979). In that decision, we found that the application of the rule will differ according to the nature of the inquiry:

we think it naturally follows, and we so hold, that in those instances where we are called upon to make a State law determination as to the existence and extent of legal rights and interests created by a written instrument, we must look to that State's parol evidence rule in deciding whether or not to exclude extrinsic evidence that bears on the disputed rights and interests under the instrument.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Our holding herein, however, should not be construed as a total rejection of the "third-party to the instrument rule" as applied in those numerous cases cited *supra*. The vast majority of such cases did not involve a determination of legal rights or property interests under State law but

---

[4]We have found that these adjustments were included in determining the number of shares of the new stock each contributor would receive under the plan.

rather concerned the proper allocation (or character) of amounts paid under a contract. Otherwise stated, such cases were not concerned with ownership of the property interest but with the true reasons for and behind its receipt by the owner. * * * In making that type of determination, we think our continued liberal admission of extrinsic evidence is required in order that we base our decisions on the substance of the documents before us rather than their form. [68 T.C. at 263. Citations omitted.]

The respondent suggests that this Court must determine which legal rights and interests were transferred by petitioner and which were received by him from Weisbart Enterprises, Inc., so that we must apply the parol evidence rule in this instance. The respondent, however, misstates our inquiry. While it is true that what the petitioner contributed and what he received in the exchange are important to our decision, these matters are not at issue, indeed, they are agreed to by even the respondent. We are not concerned here with ownership; the question before us is one of value. Whether or not there was a variance of value may determine whether the petitioner must recognize income on the exchange. Such a determination must be made on the substance of the documents before us rather than on their form. This is particularly important in the present issue because we must ascertain the "true nature" of the transaction as mandated by section 351, discussed *infra*. Accordingly, we will consider all credible evidence before us.

The second preliminary argument of the respondent is that, even if we find a basis for the admission of the evidence to which respondent objects, we may not judicially reform the contract so as to change the Federal tax consequences of a completed transaction. The respondent directs our attention to a number of cases to support this proposition. The argument of the respondent, however, presumes that consideration of this evidence will effect a reformation of the contract. We must first determine whether this is true.

The plan sets forth the terms of the exchange and then expresses the intent of the parties that each party will receive a percentage of stock equivalent in value to the percentage of their interests in the corporations contributed. The plan further provides that these valuations will be based on the book value of each corporation as adjusted for deferred tax liabilities and that the determination of the accountants as to these amounts will control. No disproportionate distribution is

apparent from the face of this instrument. The plan, itself, does not reveal the adjustments on which the respondent rests his case. These adjustments do come to light on examination of the work papers of the accountant but these work papers also reveal that the adjustments are included in the number of shares that each contributor will receive under the terms of the plan and are in that way incorporated into the plan. The position of the respondent that the exchange was to be made on the basis of book value as adjusted for deferred taxes, in this light, suggests that the plan is either internally inconsistent or ambiguous. In any event, the negotiated adjustments are part of the terms of the exchange even as presented by respondent, so that we are left not with a dispute over the terms of the exchange but rather a dispute as to why the exchange was made as it was.

The only portion of the plan that could be interpreted to suggest an explanation of terms of the plan is the expression of the parties' intent that the exchange be of equal value. Does an explanation of the negotiated adjustments on the basis of evidence extrinsic to the plan constitute a reformation of the plan? It does not change the terms of the exchange. The plan suggests, if anything, that the exchange was to be of proportionate value. The respondent has to go outside of the terms of the plan to suggest that the exchange was disproportionate. To go outside of the plan to explain its terms does not, in this context, reform the agreement, and we so hold. Indeed, where an agreement contains ambiguities or discrepancies, the surrounding facts and circumstances must be considered to determine the substance of the agreement. *Peterson Machine Tool, Inc. v. Commissioner*, 79 T.C. 72 (1982); *Ciaio v. Commissioner*, 47 T.C. 447, 461 (1967).

Since we have found that we do not reform the plan by considering the contested evidence, it is unnecessary for us to consider whether we would be constrained from reforming the agreement.

We finally come, then, to the issue of whether or not the petitioner received more than his proportionate share in the exchange. The respondent maintains that the petitioner did receive more than his proportionate share and argues that it represented either repayment of a bad debt, compensation for services, or a property dividend. Petitioner maintains that he

did not receive more than his proportionate share in the exchange and, alternatively, if he did, it was either in the nature of a gift or that any gain recognition is properly taxable to W & W rather than the petitioner. The petitioners bear the burden of proof. *Welch v. Helvering*, 290 U.S. 111 (1933).

We will first review the legal framework in which this transaction arises. Section 351 as in effect during the taxable year in question provides in pertinent part as follows:

SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANS-
FEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation (including, in the case of transfers made on or before June 30, 1967, an investment company) by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

Section 351, enacted as part of the Internal Revenue Code of 1954, was the successor to a similar section of the Internal Revenue Code of 1939.[5] The committee reports accompanying section 351 in the 1954 Code explained that:[6]

The basic change from present law made by your committee in section 351 is the elimination of the so-called "proportionate interest" test. This requirement, which appears in section 112(b)(5) of the 1939 Code, permits nonrecognition of gain and loss only if the stock and securities received by each transferor are "substantially in proportion" to the interest of such transferor in the property prior to the exchange. This requirement, which, if unsatisfied, serves to vitiate the tax-free nature of the entire transaction, caused considerable uncertainty in its application. In eliminating the proportionate interest test, your committee intends that no gain or loss will be recognized to a transferor transferring property to a corporation under section 351, irrespective of any disproportion of the amount of stock or securities received by him as a result of the transfer. Thus, if M and N each owning property having a value of $100 transfers such property to a newly formed corporation X, and M receives all of the stock, such transaction would not be subject to tax under section 351. The the extent, however, that the existing disproportion between the value of the property transferred and the amount of stock or securities received by each of the transferors results in an event taxable under other provisions of this code, your committee intends that such distribution will be taxed in accordance with its true

---

[5]Sec. 112(b)(5).

[6]H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. A116 (1954).

nature. For example, if individuals A and B, father and son, organize a corporation with 100 shares of common stock and A transfers property worth $80 in exchange for 20 shares of stock, while B transfers property worth $20 to the corporation in exchange for 80 shares of stock, no gain or loss will be recognized under section 351. If, however, it is determined that in fact A has made a gift to B, it is your committee's intention that such gift would be subject to tax under the provisions of section 2501 and following. Similarly, if in the preceding example, B had rendered services to A and the disproportion in the amount of stock received constituted, in effect, the payment of compensation by A to B, it is your committee's intention that such compensation will be appropriately taxed.

The problem with the "substantially in proportion" rule was further explained to arise from the fact that it "is often impossible accurately to value the property transferred."[7] Based on this legislative history, section 1.351–1(b)(1), Income Tax Regs., provides as follows:

Where property is transferred to a corporation by two or more persons in exchange for stock or securities, as described in paragraph (a) of this section, it is not required that the stock and securities received by each be substantially in proportion to his interest in the property immediately prior to the transfer. However, where the stock and securities received are received in disproportion to such interest, the entire transaction will be given tax effect in accordance with its true nature, and in appropriate cases, the transaction may be treated as if the stock and securities had first been received in proportion and then some of such stock and securities had been used to make gifts (section 2501 and following), to pay compensation (section 61(a)(1)), or to satisfy obligations of the transferor of any kind.

The thrust of our inquiry, then, must be to determine whether the petitioner received more than his share in the exchange. If we find such a disproportionate distribution, we must then determine the true nature of the transaction.

Section 351 clearly applies to the present transaction so that the exchange is accorded nonrecognition treatment. If applicable, section 1.351–1(b)(1), Income Tax Regs., provides a limited exception to this general rule. Were we to apply this exception, it would not have the effect of vitiating the nonrecognition of the whole transaction but rather would dictate that we view the stock as proportionately distributed but then redistributed in what might be a taxable transaction.

Respondent first argues that the petitioner received more

[7] S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 50 (1954).

than he should have in the exchange because, although the stock of W & W was held 50 percent by the petitioner's corporation, Weisbart & Co., and 50 percent by G. Weisbart & Co., Weisbart & Co.'s interest in W & W was given a greater value by Mr. Butler than G. Weisbart & Co.'s interest in W & W. This overtechnical analysis, focusing solely on the W & W portion of the exchange, misses the point of section 1.351–1(b)(1), Income Tax Regs., which provides that "the entire transaction will be given tax effect in accordance with its true nature." If a person were to contribute two pieces of property to a corporation in a single transaction, receiving $75 in stock in exchange for one piece of property and $25 in stock for the other, with each property having a fair market value of $50, no reasonable person would suggest that each of the person's contributions should be viewed separately so that he received $25 as a gift or compensation on the favorable disproportionate distribution. Economic reality cannot be perceived by isolating one piece of a transaction and ignoring the whole. The "true nature" of the Weisbart transaction must be discerned by viewing the transaction as a whole.

Respondent's main argument is that the agreement between the petitioner and Gary was intended to pay the petitioner back for his loss on the cattle that 7A Meat bought from W & W for which it did not pay. Weisbart & Co.'s 50-percent share of this $890,000 loss would be $445,000. The respondent suggests that we assume that the parties were not familiar with the correct tax bracket for W & W of 48 percent, operated under the assumption that W & W's tax bracket was 50 percent, and made an adjustment of $220,000 to approximate Weisbart & Co.'s loss after taxes of $222,500. To support this, the respondent emphasizes that the parties agreed that the petitioner's share was to be increased by the amount of $220,000, and that Gary's share was to be reduced $220,000. Respondent alternatively argues that this adjustment represented either compensation income to the petitioner or a property dividend. The respondent further argues that we should reject the petitioner's view of the transaction both because this was a family situation and because Gary was in financial distress.

While the arguments of respondent have some circumstantial appeal, we would find that the petitioner and Gary

negotiated at arm's length to determine fair market value if such a finding were necessary to our decision. Respondent's evidence at best consists of conjecture in the face of credible testimony by the petitioner, Gary, and Mr. Butler. Indeed, the committee report suggests that even if the transaction were disproportionate by error or inadvertence, as is entirely possible in such a transaction, no tax would result unless a taxable event such as a gift or compensation had been intended. We need not rest our decision on these possible grounds. The book value of a corporation is usually at best only a rough measure of fair market value. We find that Weisbart & Co., a contribution of the petitioner, was greatly undervalued by the use of the book value method when compared to the other corporations. Even if the petitioner and Gary had intended that the adjustment would repay the bad debt, the simple fact is that the petitioner did not get more than his share.

As support for his argument that the $220,000 adjustment created a disproportionate distribution, the respondent declares that the $103,000 adjustment to the Sigman stock of Tillie Kirschbaum, the petitioner's sister, was also a disproportionate distribution and that under section 1.351–1(b)(1), Income Tax Regs., this amount is properly treated as distributed to the petitioner and then transferred to Tillie as a gift. If true, this might cause the petitioner to have a gift tax liability. Although not strongly argued, we will take this suggestion seriously because it raises a jurisdictional issue.

This Court is a court of limited jurisdiction. It is fundamental that the jurisdiction of this Court depends on the issuance by the Commissioner of a notice of deficiency. Rule 13, Tax Court Rules of Practice and Procedure; *Myers v. Commissioner*, 28 T.C. 12 (1957); *Cornelius Cotton Mills v. Commissioner*, 4 B.T.A. 255 (1926). In this case, the Commissioner issued a notice of deficiency in income tax but did not issue a notice of deficiency in gift tax. The gift tax is separate and apart from the income tax. Accordingly, we have no jurisdiction to determine a liability for gift taxes.[8] Cf. *Commercial Fisher-*

---

[8]This does not mean that we cannot consider whether a gift was made as evidence as to a liability for income taxes.

men's *Inter-Insurance Exchange v. Commissioner*, 38 T.C. 915 (1962).

*Decision will be entered for the petitioners.*

