GEORGE GROSSMAN AND GERTRUDE R. GROSSMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grossman v. Commissioner
Docket No. 22864-86.
United States Tax Court
T.C. Memo 1988-278; 1988 Tax Ct. Memo LEXIS 301; 55 T.C.M. (CCH) 1155; T.C.M. (RIA) 88278; June 27, 1988. Curtis Berner, for the petitioners. Shelley Ann Chang, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: This care is before us on petitioners' motion to dismiss for lack of jurisdiction. Petitioners allege that the notice of deficiency is invalid because respondent failed to comply with the partnership audit and litigation procedures, section 6221 et seq.[1] The sole issue for out determination is whether the partnership came into existence after September 3, 1982, thereby subjecting it to the partnership audit and litigation procedures. *302 FINDINGS OF FACT
On July 14, 1982 a limited partnership, California Wind Energy 1982 (Cal Wind), was formed under the laws of California between Richard M. Farrell (Farrell) and Kevin C. O'Keefe (O'Keefe) as general partners, and John C. Parrish (Parrish) as the original limited partner. Cal Wind was formed to acquire, own and operate a wind powered electrical generating facility and to sell the generated electricity to public utilities. The terms of the original partnership agreement required the initial limited partner to contribute $ 100 as his capital contribution, which would be refunded upon is withdrawal from the partnership. No additional contributions were required from the original limited partner. [2]
The original partnership agreement did not specify the type of contribution required from the general partners. According to the offering memorandum, however, the general partners were required to make non-cash contributions to Cal Wind. Specifically, the general partners were required to contribute the sublease for the *303 generating facility, the Federal Energy Regulatory Commission certification, the Alemeda County use permit, the right to sell electric power under the power purchase agreement with Pacific Gas and Electric (PG&E), the results of extensive wind analysis for the on-site, independent engineering, and results of other consulting work performed by the general partners. All of the rights and information to be contributed by the general partners were held by Farrell and O'Keefe Properties, a general partnership owned by Farrell and O'Keefe. Each general partner was also required to purchase at least one limited partnership unit for $ 50,000 per unit, the same price paid by each other limited partner. On July 16, 1982, Cal Wind opened an operating account at Hibernia Bank in San Francisco, California and deposited the $ 100 contributed by Parrish. On July 30, 1982, Cal Wind executed three contracts. These contracts included (1) a contract with Constructing Service Corporation (CSC), a corporation wholly owned by Farrell and O'Keefe, for the procurement, construction and installation of a wind turbine electric generating facility; (2) a contract with Grant Line Energy Corporation (Grant *304 Line), another corporation owned indirectly by Farrell and O'Keefe, for the operation and maintenance of the generating facility; and (3) a contract with Tesla Transmission Services (Tesla) (with whom Farrell and O'Keefe were joint venturers) for a non-exclusive right and license to use interconnective facilities and a transmission line for the purpose of transmitting electric power. The contract between Cal Wind and CSC contained no contingency clause. The contracts between Cal Wind and Grant Line and Cal Wind and Tesla were conditioned upon the production and sale of electricity. The original Agreement and Certificate of Limited Partnership was recorded in Marin County, California and in Alemeda County, California on August 5, 1982 and on August 13, 1982, respectively. The private offering memorandum was dated August 5, 1982. Also on August 5, 1982, Cal Wind executed the following additional agreements: (1) a selling agreement with Smith Barney, Harris Upham & Co. (Smith Barney) to sell subscriptions in Cal Wind; (2) an escrow deposit agreement with the Bank of New York and Smith Barney governing the receipt of subscription funds pending the closing of the first offering; and *305 (3) an agency agreement with Farrell and O'Keefe Properties authorizing it to be Call Wind's representative with PG&E regarding the right to sell electric power to PG&E under a power purchase agreement. The offering was originally scheduled to close on September 15, 1982. The offering memorandum permitted the offering period to be extended. However, in the event 50 partnership units were not sold, the money held in escrow would be returned to the investors. Subscriptions for 50 units were received on or about September 29, 1982. The first closing took place on September 30, 1982. On that date the funds held in escrow were deposited into the partnership's operating bank account at Hibernia Bank. There were four additional closings, the last occurring on December 10, 1982. The partnership agreement was amended and restated on October 5, 1982 and an Amended and Restated Certificate of Limited Partnership was recorded on October 6, 1982. On or about that date Farrell and O'Keefe contributed the contract rights and information as required in the offering memorandum. According to the offering memorandum and the original certificate of limited partnership Cal Wind was formed *306 as of July 14, 1982. According to the Amended and Restated Certificate of Limited Partnership Agreement "The partnership commenced upon recordation of its certificate of limited partnership on August 5, 1982 * * *." On its timely filed partnership return Cal Wind reported that business commenced on July 14, 1982 and that it actively operated for six months during that year. Cal Wind claimed six months' amortization expenses and stated the expenses were incurred on July 14, 1982. Respondent began the audit of Cal Wind on January 9, 1985. All of Cal Wind's books and records were made available to respondent. On April 14, 1986, respondent mailed a notice of deficiency to petitioners, limited partners of Cal Wind. The deficiency was based upon a disallowance of petitioners' distributive share of Cal Wind's claimed loss and investment and business energy credits for 1982. OPINION The issue for decision is when Cal Wind came into existence. The issue of when a partnership is formed has been addressed by the Court numerous times. Peters v. Commissioner,89 T.C. 423 (1987); Frazell v. Commissioner,88 T.C. 1405 (1987); Torres v. Commissioner,88 T.C. 702 (1987); *307 Sparks v. Commissioner,87 T.C. 1279 (1986). Henzel Phelps Construction Co. v. Commissioner,74 T.C. 939 (1980), affd. 703 F.2d 485 (10th Cir. 1983). If the Cal Wind partnership was formed after September 3, 1982, we must grant petitioners' motion to dismiss for lack of jurisdiction because respondent has not complied with the partnership audit and litigation procedures and the notice of deficiency would be invalid. Maxwell v. Commissioner, 87 T.D. 783 (1986). A partnership's first tax year commences on the date the partnership is formed. Sparks v. Commissioner, supra, at 1282. The date of formation of a partnership for tax purposes is determined under Federal tax laws, not state law. Commissioner v. Tower,327 U.S. 280 (1946); Frazell v. Commissioner, T.C. at 1412; Sparks v. Commissioner,87 T.C. at 1282. For Federal tax purposes, a partnership is formed when the parties to a venture join together capital or services with the intent of presently conducting an enterprise *308 or business. Commissioner v. Culbertson,337 U.S. 733, 742 (1949); Frazell v. Commissioner,88 T.C. at 1412; Sparks v. Commissioner,87 T.C. at 1282. A partnership is deemed formed as of the date the first parties to the venture acquire a proprietary interest in capital or profits. Sparks v. Commissioner,87 T.C. at 1283. We consider all facts and circumstances in making this decision. Petitioners contend that the intent to presently conduct business did not coexist with a joining together of capital or services until after the closing of the first offering. In support of their contention petitioners argue that the contracts executed on July 30, 1982 were all contingent upon the closing of the initial offering and that the general partners did not transfer their capital contribution until about October 6, 1982. Moreover, petitioners argue that the reporting of erroneous information on the partnership return should not dictate the results in this case. In contrast respondent contends that the general partners contributed their services to Cal Wind in executing all of the contracts and that the other documents *309 (the offering memorandum, the partnership agreement, the partnership return and the Certificate of Limited Partnership) all evidence the intent to presently conduct business before September 3, 1982. In making our determination of when Cal Wind was formed we must consider all of the facts. Clearly, this includes review of all of the documents submitted both by petitioners and respondent. As a preliminary matter, however, respondent questions the propriety of the Court's considering extrinsic evidence explaining or contradicting the contracts in determining the partnership's intent. Parol Evidence Rule
Respondent, relying on the parol evidence rule, objects to the Court's considering additional evidence because each of the contracts contained an integration clause. That is, the contracts' terms specify that the contracts represent the total agreement between the parties. Moreover, respondent contends the contracts are unambiguous; therefore, petitioners should be precluded from submitting any evidence contradicting or explaining the terms of the agreement. We agree with respondent that the contracts are unambiguous. [3] Therefore, the preliminary question we must answer *310 is whether extrinsic evidence is admissible to determining the intent of one of the parties to a contract in an action against respondent, who was not a party to the contract. The Court has approached this question in two different ways. In cases involving the determination of state property rights we have relied upon the state's law regarding the admissability of parol evidence. Estate of Craft v. Commissioner,68 T.C. 249 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979). In certain other cases involving the interpretation of a contract we have applied the "third party to the instrument rule." Estate of Craft v. Commissioner, supra.Since in this case we are interpreting a contract to determine when a partnership was formed for tax purposes, not to determine a party's property right, the third party to the instrument rule is *311 the appropriate approach to use. In basic terms the third party to the instrument rule, as applied by the Court prevents petitioners or respondent from relying on the parol evidence rule to exclude extrinsic evidence offered by the other. Estate of Craft v. Commissioner, supra at 260. See also Smith v. Commissioner,82 T.C. 705, 716 n. 12 (1984); Ellison v. Commissioner,80 T.C. 378, 393-394 (1983); Weisbart v. Commissioner,79 T.C. 521, 534-535 (1982). As we stated in Estate of Craft v. Commissioner, supra at 260, "We have justified this rejection of the parol evidence rule on the theory that, in the taxation area, administrators and courts are concerned with substance not form and, therefore, formal written documents should not be rigidly binding on either the petitioner or respondent." (Citations omitted.) Therefore, we disagree with respondent and find that petitioners are permitted to submit additional evidence as to the contracting parties' true intent when entering the contract. However, in *312 order to overcome the written language of the contract, petitioners must show "strong proof" that the terms of the written instrument do not reflect the actual intentions of the parties to the contract. [4]G C Services Corp. v. Commissioner, T.C. 406, 412 (1979). *313 Partners' Intent
Petitioners presented afffidavits and testimony from O'Keefe, a general partner of Cal Wind. O'Keefe stated that the partnership did not intend to conduct business when the general partners executed the contracts and that all three contracts were intended to be contingent on the closing of the first offering. Additionally, O'Keefe specifically stated that CSC is a California corporation owned by himself and Farrell and that Grant Line is a wholly owned subsidiary of Altamont Energy Corporation, which is owned exclusively by himself and Farrell. Furthermore, O'Keefe stated that Parrish, the original limited partner who was an employee of one of the wholly owned Farrell and O'Keefe entities, was acting as their agent in entering the limited partnership and he and Farrell gave Parrish the $ 100 to contribute to the partnership. Considering these facts in conjunction with the terms of the contracts and the other documents relating to the partnership, we could fairly conclude that Cal Wind did not intend to presently conduct business until after September 3, 1982. The documents standing alone do not reflect one date on which the partnership was formed. However, *314 every document in evidence suggests operations predating September 3, 1982. The offering memorandum, the partnership agreement and the partnership return indicated July 14, 1982 as the date of formation. In addition, the operating bank account was opened on July 16, 1982. The certificate of limited partnership was filed in Marin County on August 5, 1982 and in Alameda County on August 13, 1982. The three contracts relating to the actual functioning of the generating facility were executed on July 30, 1982. On August 5, 1982 Cal Wind entered into several agreements to allow for the sale of subscriptions to the partnership. The selling agreement with Smith Barney also specifically states that all the contracts were effective binding obligations on the date they were executed. However, when we look beyond the documents before us and consider the realities, both economic and contractual, it appears that all of the actions predating the closing of the first offering could be viewed as pre-operating activities. The reality is that without the successful first closing the partnership would never have been capitalized. The selling agreement with Smith Barney specifies that unless *315 a minimum of 50 limited partnership units were purchased, all of the subscriber money held in escrow would be returned. Parrish, the sole original limited partner, contributed only $ 100 given to him by the two general partners with no obligation for a future contribution. Farrell and O'Keefe had no obligation to contribute cash to the partnership except to the extent of subscribing for one limited partnership unit each, which, without 48 other subscribers, would be returned. In addition, the contracts with Tesla and Grant Line were contingent upon the production of electricity. The production of electricity was necessarily contingent upon the partnership's building of the generating facility. The building of the generating facility, while not contingent on any event according to the terms of the contract, was to be constructed by a corporation wholly owned by the only general partners of Cal Wind. In Sparks v. Commissioner,87 T.C. 1279 (1986), the general partner had incurred expenses, commenced negotiations with third parties, and obtained some subscriptions prior to September 3, 1982. The offering was not closed, however, until December 1982, and the partnership *316 documents stated that the partnership would be formed and the interests of the parties would vest only on completion of the offering. Until the offering was closed in December 1982 all subscription money received was kept in an escrow account and was not available for use by the partnership. We stated that the solicitation of capital from prospective partners does not create a partnership, 87 T.C. at 1283, and characterized the general partners' activities before the completion of the offering as pre-operating activities. Conversely, in Frazell v. Commissioner,88 T.C. 1405 (1987), we found the following factors showed an intent to form a partnership by the end of 1982: [5] the partnership was fully subscribed, all contributed capital had been deposited in its operating account, and the capital had been employed in the partnership's business. Further, the general partner had entered into four lease agreements to acquire assets and had prepaid rent for the full term of each lease. Although the recorded agreement of limited partnership was dated 1983 and provided that the "partnership shall commence on the date on which the certificate has been recorded" *317 we held that it was a partnership for Federal tax purposes prior to 1983. We found a present intent to conduct a business enterprise by the fact that the partnership had acquired all of its business assets, and we held it was an unincorporated organization through which a business, financial operation, or venture was carried on as of December 1982. The case at bar more closely resembles the facts of Sparks than of Frazell. Here, the subscriber money was held in escrow until a minimum of 50 limited partnership units were purchased. This did not occur until September 29, 1982. The first closing occurred September 30, 1982, and on that date the funds held in escrow were deposited into the partnership's operating bank account. It was not possible for the partnership to conduct business until the partners' capital interests had vested, nor do we believe the partners intended to conduct business until this occurred. We therefore hold that Cal Wind was a partnership formed after September 3, 1982 and *318 was thus subject to the partnership audit and litigation procedures of section 6621 et seq. for its 1982 taxable year. [6] Respondent's statutory motion of deficiency is, therefore, invalid. Petitioners' motion to dismiss for lack of jurisdiction will be granted. Accordingly, An appropriate order will be issued.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue. ↩
2. Parrish was an employee of an entity wholly owned by Farrell and O'Keefe. Farrell and O'Keefe provided the $ 100 contributed by Parrish. ↩
3. If the contracts were ambiguous then we would be permitted to go beyond the instrument to decipher the parties' intent. Smith v. Commissioner,82 T.C. 705, 713-716↩ and n. 9 (1984). 4. We reject respondent's request to apply the so-called Danielson rule to the case before us. In Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967), cert. denied 389 U.S. 858 (1967), the Third Circuit held that a taxpayer may avoid the unambiguous terms of a contract only by proving the existence of fraud, mistake, undue influence or duress, etc. We have repeatedly declined to adopt this rule. Elrod v. Commissioner,87 T.C. 1046, 1065 91986); Coleman v. Commissioner,87 T.C. 178, 202 and n. 17 (1986); affd. without published opinion 833 F.2d 303 (1987); G C Services Corp. v. Commissioner, supra at 412 and n. 2. Since this case is appealable to the Ninth Circuit, we are not bound by the Third Circuit's decision in Danielson.Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985↩ (10th Cir. 1971). 5. In that case, respondent, who had not complied with the partnership audit and litigation procedures of sec. 6221 et seq.↩ for 1982, argued that the partnership was not formed until 1983. 6. We note that the audit began on January 9, 1985. All of Cal Wind's books and records were made available to respondent. The statutory notice was mailed to petitioners on April 14, 1986. Ample opportunity existed for respondent to learn the relevant fats and in sufficient time to correct the matter. ↩